*Whitney Wheeling, et al. v. Selene Finance LP, et al.*, No. 27, September Term, 2020, Opinion by Booth, J.


**Pleading a Cause of Action under Real Property Article § 7-113** – The Petitioners' amended complaint adequately pleaded a private cause of action under Real Property Article § 7-113. The statute does not require that a protected resident be deprived of actual possession of the property as a condition precedent to bringing a private cause of action for damages.

**Pleading a Private Cause of Action under the Maryland Consumer Protection Act, Commercial Law Article § 13-101** *et seq.* **("MCPA")** – The Petitioners' amended complaint adequately pleaded a private cause of action under the MCPA. Although damages must be pleaded in a private action brought under the MCPA, the general rule of pleading set forth in Maryland Rule 2-303(b) applies. Under Maryland law, damages for emotional injuries may only be recovered if they are accompanied by physical manifestations capable of objective determination. Taking all inferences in the light most favorable to the Petitioners, the amended complaint, alleging "emotional damages with physical manifestations" adequately pleaded a claim for emotional damages.

**Attorney's Fees Alleged as Damages** – Petitioners are not entitled to recover attorney's fees for consulting an attorney to "know their rights" as separate compensable damages. We decline to expand our collateral litigation exception to the American Rule to permit the recovery of attorney's fees as damages where the fees were not incurred in collateral litigation with a party other than the defendant, nor otherwise incurred to protect an interest *vis-à-vis* a third party.

Circuit Court for Baltimore City
Case No.: 24-C-17-000996
Argued: January 5, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 27

September Term, 2020

WHITNEY WHEELING, et al.

v.

SELENE FINANCE LP, et al.

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Harrell, Glenn T., Jr.,
 (Senior Judge, Specially Assigned),

JJ.

Opinion by Booth, J.
Hotten and Getty, JJ., concur and dissent.

Filed: April 30, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This case requires that we determine whether the circuit court and the Court of Special Appeals erred in dismissing an amended complaint for failure to state a claim upon which relief can be granted. The Petitioners, Eric and Whitney Wheeling and Joanne Rodriguez, were occupants of residential property that they owned or leased. They initiated this action in the Circuit Court for Baltimore City, against Respondents, Selene Finance LP ("Selene"), a mortgage servicer, and Gina Gargeu d/b/a Century 21 Downtown ("Gargeu" or "Century 21"), a real estate broker, after Respondents posted eviction notices on Petitioners' properties, attempting to gain possession of the properties through self-help measures without a court order.

Petitioners' amended complaint alleges that the Respondents violated two statutes—Maryland Code Real Property Article ("RP") § 7-113, and the Maryland Consumer Protection Act (the "MCPA"), codified at Maryland Code Commercial Law Article ("CL") § 13-101 *et. seq.* Both statutes create a private right of action that authorize, among other things, a plaintiff to recover his or her actual damages incurred as a result of the defendant's unlawful conduct. RP § 7-113 was enacted by the General Assembly in 2013 and restricts the use of self-help in certain kinds of residential evictions. Without a court order, a person claiming the right to possession of a residential property may only resort to self-help evictions if the person posts a notice that complies with the requirements of the statute, and only if he or she "reasonably believes the protected resident has abandoned or surrendered possession of the property based on a reasonable inquiry into the occupancy status of the property[.]" RP § 7-113(b)(2)(ii)(1).

After learning of the eviction notices that were posted on their respective properties, the Petitioners allege that they consulted with counsel to "know their rights." In both instances, the Petitioners did not vacate the premises in response to the eviction notices. Although the Respondents' actions did not cause them to leave, the Petitioners allege that the Respondents' unlawful act of posting the eviction notices without ascertaining the occupancy status of the property caused them to suffer two forms of compensable damages—(1) "emotional damages and losses with physical manifestations" such as fear that they would lose their home; and (2) economic damages in the form of attorney's fees they incurred to understand their rights.

Selene and Ms. Gargeu filed motions to dismiss the amended complaint on the basis that it failed to state a cause of action. The circuit court granted both motions. The Wheelings and Ms. Rodriguez noted a timely appeal. In a reported opinion, the Court of Special Appeals affirmed the judgment of the circuit court. *Wheeling v. Selene Finance LP*, 246 Md. App. 255 (2020).

The intermediate appellate court determined that the amended complaint alleges facts that, if proven, establish that the Respondents violated RP § 7-113. *Id.* at 260. However, the court concluded that a private cause of action arising under RP § 7-113 is only extended to residents who vacate the property as the result of the improperly posted eviction notice. *Id.* at 279. The Court of Special Appeals further determined that, "[a]ssuming for purposes of analysis that Selene's actions violated the MCPA, the amended complaint fails to allege damages with the specificity required for private causes of action under that statute." *Id.* at 261.

2

For the reasons set forth more fully below, we reverse the judgment of the Court of Special Appeals in part and affirm it in part. We hold that the Petitioners' amended complaint adequately sets forth a cause of action under RP § 7-113 and that the statute does not require that a protected resident be deprived of actual possession as a condition to bringing a private cause of action. We further hold that, under our jurisprudence, we have not established a more demanding standard for pleading damages in private actions brought under the MCPA. Although actual damages must be pleaded in a private cause of action brought under that statute, the general rule of pleading as articulated in Maryland Rule 2-303(b) applies. Under Maryland law, damages for emotional injury may only be recovered if they are accompanied by physical manifestations capable of objective determination. Petitioners' amended complaint alleges that Petitioners suffered "emotional damages and losses with physical manifestations[.]" Although the emotional damages pleaded in the amended complaint are sparse, they supply the minimum to state a claim. We affirm the judgment of the Court of Special Appeals, however, with respect to the Petitioners' assertion that they are entitled to their attorney's fees incurred to "know their rights" as separate compensable damages. Under both RP § 7-113 and the MCPA, Petitioners would be entitled to their reasonable attorney's fees incurred to prosecute their case (assuming they prevail). We determine that the Petitioners' damages claim related to their pre-litigation, consultation attorney's fees do not fall within any of our common law exceptions to the American Rule, which prohibits recovery of attorney's fees as separate compensable damages.

3

# I.

## Factual Background and Procedural History

Because this case was decided on a motion to dismiss, we take the well-pleaded allegations set forth in the amended complaint as true for purposes of our analysis, and we recount them here as alleged.

### A.  *Facts as Alleged in the Complaint*

#### *The Wheeling Claim*

At all times relevant to this case, the Wheelings and their children were renting property in Anne Arundel County from the property owner, Donna Poole.  Prior to the Wheelings' tenancy, Ms. Poole purchased the property through a mortgage loan with CitiMortgage, Inc.  After Ms. Poole defaulted on her loan in 2013, the loan was acquired by Christiana Trust, as trustee for Normandy Mortgage Loan Trust Series 2013-9 ("Normandy").

Selene is a mortgage lender and servicer licensed to operate in Maryland.  Selene acted as Normandy Mortgage's servicer for Ms. Poole's mortgage.  On May 15, 2015, Selene, on behalf of Normandy, claimed to have a right to possess the property and posted an eviction notice on the home.  The notice stated, in pertinent part:

**IMPORTANT NOTICE ABOUT EVICTION**

A PERSON WHO CLAIMS THE RIGHT TO POSSESS THIS PROPERTY BELIEVES THAT THIS PROPERTY IS ABANDONED.  IF YOU ARE CURRENTLY RESIDING IN THE PROPERTY, YOU MUST IMMEDIATELY CONTACT:

Selene Finance
NAME

4

9990 Richmond Avenue, Suite 400 S
Houston, TX 77042
ADDRESS

(877) 768-3759
TELEPHONE NUMBER

5/15/15
DATE OF THIS NOTICE

IF YOU DO NOT CONTACT THE PERSON LISTED ABOVE WITHIN 15 DAYS AFTER THE DATE OF THIS NOTICE, THE PERSON CLAIMING POSSESSION MAY CONSIDER THIS PROPERTY ABANDONED AND SEEK TO SECURE THE PROPERTY, INCLUDING CHANGING THE LOCKS WITHOUT A COURT ORDER

When the eviction notice was placed on the door, the Wheeling property was not subject to any foreclosure proceeding, nor did Selene have any reasonable basis to believe that the Wheeling property was vacant. On the contrary, the Wheelings and their children openly occupied the house, and Selene was in the process of negotiating with Ms. Poole about a short sale.

Mr. Wheeling contacted Selene at the telephone number listed on the eviction notice on May 19, 2015. A Selene representative falsely told Mr. Wheeling that Selene had initiated foreclosure proceedings, when in fact, no such proceedings had been filed. The Selene representative also told Mr. Wheeling that Selene believed that the property was abandoned solely because the Wheelings were not the owners. Additionally, the representative told Mr. Wheeling that if the Wheelings did not vacate the property by June 1, 2015, the locks would be changed, and they would be evicted with the assistance of the Sheriff's Department.

5

As a result of, and in reliance on, the eviction notice and the statements made by Selene's representative, the Wheelings incurred legal expenses by seeking legal advice to understand their rights as tenants on the property. They also suffered emotional distress with physical manifestations.

The amended complaint did not allege that the Wheelings vacated the home as a result of Selene's actions, nor did it allege that Selene took any steps other than posting the eviction notice to force or induce them to move.

*The Rodriguez Claim*

Ms. Rodriguez was the owner and occupant of property located in Baltimore City during the relevant time period. She purchased the property in 2008 through a mortgage backed by a federal housing program. After she was unable to make timely payments, the loan went into default and was eventually transferred to Sunset Mortgage Loan Trust, Series 2014-1 ("Sunset Mortgage").

Selene, acting on behalf of Sunset Mortgage, filed a foreclosure action against the Rodriguez property. Sunset Mortgage was the successful bidder at the foreclosure sale and acquired the property for $42,000. The sale was ratified in September 2016.

In February 2017, Selene contracted with Century 21 Downtown, a real estate brokerage company operated by Ms. Gargeu. Acting as Selene's agent, Ms. Gargeu scheduled a sheriff's eviction. On February 10, the sheriff posted a notice on the property informing the occupants that they would be evicted pursuant to a court order on March 28, 2017. Ms. Rodriguez began preparing to vacate the property in reliance on the deadline in the sheriff's notice.

6

A little less than two weeks later, on February 22, Ms. Gargeu posted an eviction notice on the Rodriguez property that was identical to the notice posted on the Wheeling property, but for differences in names, address, and other incidental information. When the eviction notice was placed on the home, Selene and Century 21 had no reasonable basis to believe that the property was vacant because Ms. Rodriguez had opposed the foreclosure proceeding, was represented by counsel, and her possessions remained in place. Selene did not disclose to Ms. Rodriguez's lawyer in the foreclosure that it had posted the eviction notice. Ms. Rodriguez learned about the eviction notice through her neighbor. After seeing the eviction notice, Ms. Rodriguez's neighbor called Ms. Gargeu and told her that Ms. Rodriguez still occupied the property. Fearing that she might come home from a medical appointment to find her personal belongings on the curb or stolen, Ms. Rodriguez alleges that she incurred additional legal expense by consulting her lawyer in the foreclosure to understand her rights concerning Selene's and Century 21's actions arising from their threats to evict her prior to the March 28 date established in the sheriff's notice. Ms. Rodriguez also alleges that she suffered severe emotional distress, including fear, anxiety, and anger with physical manifestations.

### B. Circuit Court Proceeding

The Wheelings and Ms. Rodriguez initiated this action on March 1, 2017 in the Circuit Court for Baltimore City on behalf of themselves and a proposed class of persons similarly situated. On May 30, 2017, they filed an amended complaint. The amended complaint asserts two claims against Selene and Ms. Gargeu. First, the amended complaint alleges that Selene and Ms. Gargeu violated RP § 7-113(b) by

7

making threats of eviction without first making a reasonable inquiry as to whether the properties were, in fact, abandoned. Second, they allege that Selene and Ms. Gargeu violated the MCPA by threatening to take possession of their properties by posting the eviction notices. Petitioners requested that the court certify their claims as a class action, grant them declaratory and injunctive relief, and award them monetary damages and attorney's fees.

Selene and Ms. Gargeu both filed motions to dismiss the amended complaint for failure to state a claim, contending that: (1) they were not liable under RP § 7-113 because the eviction notices did not constitute a "threat" as defined in that statute; (2) the MCPA did not apply in this case because (a) the Wheelings and Ms. Rodriguez are not "consumers" as defined in the MCPA, and (b) posting an eviction notice on a residence is not a collection activity within the provisions of the MCPA; (3) Selene, as a licensed mortgage lender, was exempt from the provisions of the MCPA; and (4) the Wheelings and Ms. Rodriguez did not sufficiently plead damages in their complaint and could not show any accompanying physical manifestations of their emotional distress.

For their part, the Wheelings and Ms. Rodriguez responded that RP § 7-113 requires that a party who posts an eviction notice first make a reasonable inquiry as to the occupancy status of the property, and that Selene and Ms. Gargeu failed to do this before posting the eviction notices. The Wheelings and Ms. Rodriguez pointed out that both properties were inhabited at the time the eviction notices were posted. They asserted that Selene and Ms. Gargeu's failure to make reasonable inquiry before posting the notices caused them damages, and accordingly, the case should go to the trier of fact to resolve these issues. As

8

for the MCPA claim, the Wheelings and Ms. Rodriguez asserted that the MCPA allows for the recovery of non-economic damages for emotional injuries, which they contend was properly pleaded.

The circuit court granted both motions to dismiss without leave to amend. The court concluded that the eviction notices posted by Selene and Ms. Gargeu conformed with the provisions of RP § 7-113. As to Selene, the court concluded that the amended complaint failed to allege sufficient facts to state a claim upon which relief could be granted because the Wheelings and Ms. Rodriguez were not evicted or otherwise deprived of their property and, therefore, did not suffer an objectively identifiable actual injury. As to Ms. Gargeu, the court concluded that the MCPA did not apply to her because CL § 13-104 exempts real estate brokers from the provisions of the MCPA.[1] The Wheelings and Ms. Rodriguez filed a timely notice of appeal.

### C. *Court of Special Appeals Proceeding*

The Court of Special Appeals affirmed the judgment of the circuit court. *Wheeling*, 246 Md. App. at 255. Interpreting RP § 7-113, the intermediate appellate court determined that under its plain language, "the cause of action established by the statute is limited to cases in which the party seeking possession locks a protected person out of the property, intentionally terminates or diminishes utility, water and sewer and similar services to the property, or takes 'any other action' which deprives a protected resident of actual possession of the property." *Id.* at 279. The court concluded that, even where the party

---

[1] The Petitioners did not appeal the dismissal of the MCPA claims against Ms. Gargeu. Accordingly, that claim is no longer part of the case.

seeking possession does not make the required reasonable inquiry prior to posting the eviction notices, the statutory cause of action does not extend to the Wheelings and Ms. Rodriguez because they did not vacate the properties. *Id.*

Turning to the Wheelings' and Ms. Rodriguez's claims under the MCPA, the Court of Special Appeals assumed "for the purposes of analysis that one or more aspects of Selene's alleged behavior constituted a violation of the MCPA." *Id.* at 280. The court determined that Petitioners had not sufficiently pleaded their damages in the amended complaint, reasoning that the "Court of Appeals has imposed a more demanding standard for pleading damages in private actions brought under the MCPA." *Id.* at 282. The court concluded that the "requirements of this standard are particularly relevant in cases, like the present one, that involve claims for emotional distress." *Id.* The intermediate appellate court determined that the amended complaint "does not allege that [the Wheelings and Ms. Rodriguez] manifested any observable physical manifestations of the emotional distress caused by Selene." *Id.* at 286. Instead, the court reasoned that the allegations in the amended complaint simply reflected that Selene's actions upset them. *Id.* The Court of Special Appeals concluded that the "MCPA requires more in order for a complaint to survive a motion to dismiss for failure to state a cause of action." *Id.* The intermediate appellate court also concluded that the Wheelings' and Ms. Rodriguez's allegation that they incurred attorney's fees as monetary damages to understand their rights after learning of the eviction notices did not change the result. *Id.*

10

The Wheelings and Ms. Rodriguez filed a petition for writ of *certiorari*. We granted

*certiorari* to answer the following questions, which we have slightly rephrased:[2]

1. Did the Court of Special Appeals err in holding that a defendant's violation of RP § 7-113 does not give rise to a cause of action unless the protected resident physically vacates the residential property?

2. Did the Court of Special Appeals err in holding that the Petitioners failed to sufficiently plead emotional damages, thereby warranting dismissal of their claims?

3. Did the Court of Special Appeals err in holding that the Petitioners could not claim attorney's fees incurred to consult with an attorney to "know their rights" as separate compensable damages?

For the reasons more fully set forth below, we answer questions one and two in the

affirmative, and question three in the negative.

---

[2] The questions presented in the petition for writ of *certiorari* are:

1. Did the Court of Special Appeals err in holding that a defendant's violation of RP § 7-113 does not give rise to a cause of action unless the protected resident physically vacates the residential property?

2. Did the Court of Special Appeals err in holding that a consumer's claim for emotional damage, such as fear, anxiety, anger, and accompanying physical manifestations, does not adequately allege an injury to state a cause of action under the MCPA?

3. Did the Court of Special Appeals err in holding that attorney's fees incurred as a result of a defendant's unfair and deceptive misrepresentations made in violation of the MCPA do not constitute a recoverable injury supporting a private cause of action?

11

## II.

## Discussion

This case involves the interpretation of two statutes that establish private causes of action. Where questions of law and statutory interpretation are presented, this Court reviews them *de novo*, without deference to either the circuit court's or the Court of Special Appeals' analysis. *See Goshen Run Homeowner's Ass'n v. Cisneros*, 467 Md. 74, 88 (2020); *Harvey v. Marshall*, 389 Md. 243, 257 (2005). The issues in this case also involve the sufficiency of Petitioners' amended complaint and whether it adequately sets forth a cause of action under the applicable statutes.

Under Maryland Rule 2-322(b)(2), the court may dismiss a complaint if it fails "to state a claim upon which relief can be granted." A motion to dismiss is properly granted if the factual allegations in a complaint, if proven, would not provide a legally sufficient basis for the cause of action asserted in the complaint. *See, e.g.*, *Barclay v. Castruccio*, 469 Md. 368, 374 (2020). This Court reviews "a trial court's grant of a motion to dismiss, without deference, to determine whether it was legally correct." *Id.* at 373. In doing so, we "must assume the truth of all relevant and material facts that are well pleaded and all inferences which can reasonably be drawn from those pleadings." *Id.* at 373–74 (quoting *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 121 (2007)). A motion to dismiss on this ground may only be granted where the allegations presented do not state a cause of action. *Barclay*, 469 Md. at 374. In determining whether a plaintiff has alleged claims upon which relief can be granted, there is a big difference between that which is necessary to prove the elements, and that which is necessary to merely allege them. *Lloyd*, 397 Md. at 121–22.

12

Indeed, our decision does not "pass on the merits of the claim," but instead, we merely "determine[] the plaintiff's right to bring the action." *Id.* at 122.

The general rule governing sufficiency of pleadings is set forth in Maryland Rule 2-303(b), which states that:

> Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleadings are required. *A pleading shall contain only such statements of fact as may be necessary to show the pleader's entitlement to relief or ground of defense.* It shall not include argument, unnecessary recitals of law, evidence, or documents, or any immaterial, impertinent, or scandalous matter.

(Emphasis added). Under Maryland's liberal pleading standard, "a plaintiff need only state such facts in his or her complaint as are necessary to show an entitlement to relief." *Johns Hopkins Hosp. v. Pepper*, 346 Md. 679, 698 (1997).

Our *de novo* review in this matter begins and ends with an examination of the four corners of the amended complaint to determine whether the Wheelings and Ms. Rodriguez have adequately pleaded facts sufficient to support a cause of action for the two statutory claims asserted in that pleading.

### A. Cause of Action for Violation of RP § 7-113(b)

This case presents us with our first opportunity to consider a statutory cause of action arising under RP § 7-113, which was enacted in 2013 by the General Assembly. 2013 Md. Laws ch. 514, § 1 ("HB 1308"). The statute was enacted in response to this Court's decision in *Nickens v. Mount Vernon Realty Group*, 429 Md. 53 (2012), in which we held that a foreclosure purchaser had the ability to exercise the common law remedy of

13

peaceable self-help, or in other words, the right to lawfully enter and repossess the property without a court order. *See* Fiscal and Policy Note for HB 1308.

In response to our holding in *Nickens*, the General Assembly passed RP § 7-113, which significantly narrowed the scope of self-help evictions in situations involving residential properties. Under the statute, the general rule is that "possession of residential property from a protected resident [may be taken] only in accordance with a writ of possession issued by a court and executed by a sheriff or constable." RP § 7-113(b)(2)(i). The statute contains a limited exception to the general rule—permitting a party seeking possession to use self-help to obtain possession of properties that appear to be abandoned, but only after making a "reasonable inquiry into the occupancy status of the property," based upon a reasonable belief that the property has been abandoned or surrendered, and only after posting a notice that complies with the provisions of subsection (c). RP § 7-113(b)(2)(ii).

Where a party claiming the right to possession violates subsection (b) of the statute, the General Assembly has created a private cause of action. The statute authorizes a protected resident to seek a variety of remedies, including an order granting possession of the property, actual damages, and reasonable attorney's fees and costs, after a judicial determination that the party claiming the right to possession violated subsection (b) of the statute. RP § 7-113(d).

In this case, we are asked to determine whether the language of the statute requires that a protected resident be dispossessed of the property in order to avail himself or herself of the remedies available under the statute when a violation occurs. To ascertain the

14

meaning of the statute, we apply the rules of statutory construction that we have repeated in decisions of this Court too numerous to count. For completeness, we once again repeat them here.

### 1. *Pertinent Canons of Statutory Interpretation*

When undertaking an exercise in statutory interpretation, we start with the cardinal rule of statutory interpretation—to ascertain and effectuate the General Assembly's purpose and intent when it enacted the statute. *75-80 Properties, L.L.C. v. RALE, Inc.*, 470 Md. 598, 623 (2020). "A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny." *Lockshin v. Semsker*, 412 Md. 257, 274 (2010) (citations omitted).

To ascertain the intent of the General Assembly, our analysis begins with the normal, plain meaning of the language of the statute. *Id.* at 275. In doing so, we read the plain meaning of the language of the statute "as a whole, so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Koste v. Town of Oxford*, 431 Md. 14, 25–26 (2013) (internal quotations omitted). Additionally, "[w]e neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute 'with forced or subtle interpretations' that limit or extend its application." *Lockshin*, 412 Md. at 275 (citations omitted). "If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resorting to other rules of construction." *Id.*

15

As we stated in *Lockshin*:

> We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

> Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions.

> In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.

*Id.* at 275–76 (internal citations omitted).

In addition to the above-described canons that we routinely employ, there are other canons that we occasionally pull out of the arsenal depending upon the type of statute in question. Sometimes, the application of available canons may lead to conflicting interpretations depending upon which standard wins the day. In this case, in reaching their interpretation of RP § 7-113, the Court of Special Appeals relied upon the principle that, where a statute confers a right in derogation of the common law, we must strictly construe its terms. *Wheeling*, 246 Md. App. at 278–79 (citing *Cosby v. Dept. of Human Resources*, 425 Md. 629, 645 (2012)). Selene and Ms. Gargeu urge us to apply this principle in a

16

manner consistent with the Court of Special Appeals' application. As a counterpoint to this canon, the Wheelings and Ms. Rodriguez urge us to rely upon another well-settled canon—that where a statute provides remedies not available at common law, the statute is remedial in nature, and we liberally construe a remedial statute in order to effectuate its broad remedial purpose. *Lockett v. Blue Ocean Bristol, LLC*, 446 Md. 397, 424 (2016); *Pak v. Hoang*, 378 Md. 315, 326 (2003). We discuss these canons further in our interpretation of this statute below.

2. *Deconstructing the Elements*

a. Prohibited Conduct—Taking Possession and Threatening to Take Possession

Section 7-113(b) of the statute sets forth the general prohibitions on non-judicial evictions of owner-occupied residential properties. Starting with the plain language of the statute, RP § 7-113(b)(1) provides:

> Except as provided in paragraph (2) of this subsection, a party claiming the right to possession may not take possession or threaten to take possession of residential property from a protected resident by:
>
> (i)     Locking the resident out of the property;
> (ii)    Engaging in willful diminution of services to the protected resident; or
> (iii)   Taking any other action that deprives the protected resident of actual possession.

By its plain terms, subsection (b) prohibits a person claiming possession[3] from taking possession or threatening to take possession of residential property from a protected

---

[3] RP § 7-113(a)(2) defines a "[p]arty claiming the right to possession" as meaning a person who:

(i)     Does not have actual possession of a residential property; and

17

resident,[4] unless the person claiming the right to possession can avail himself or herself of the exception set forth in (b)(2)(ii). Under the definitions contained in the statute, "'threaten to take possession' means using words or actions intended to convince a reasonable person that a party claiming the right to possess intends to take imminent possession of residential property in violation of this section." RP § 7-113(a)(5).

b. <u>The Safe Harbor Provision—Limited Circumstance Where Self-Help Eviction is Permitted</u>

The statute sets forth a safe harbor provision, which allows a party claiming a right to possession to engage in a self-help eviction (and avoid liability under the statute) in limited circumstances and only where the party complies with the statutory requirements. The statute explicitly states that a court order is *required* to obtain possession of the residential property *unless* the party claiming the right to possession complies with the

---

(ii)   Has or claims to have a legal right to possession of the residential property:
1. By the terms of a contract or foreclosure sale;
2. Under a residential lease or sublease that has an initial term of 99 years renewable forever and that creates a leasehold estate subject to the payment of periodic installments of an annual lease amount; or;
3. Under a court order, including a court order extinguishing a right of redemption.

[4] The phrase "protected resident" is defined as meaning "an owner or former owner in actual possession of residential property[,]" and includes "a grantee, tenant, subtenant, or other person in actual possession by, through, or under an owner or former owner of residential property." RP § 7-113(a)(3)(i) and (ii). The phrase does not include a trespasser or squatter. *Id.* at (iii).

18

provisions of RP § 7-113(b)(2)(ii).[5]  In the absence of such a court order, a party claiming

the right to possession of residential property may use nonjudicial self-help to take

possession of the property, if the party:

1. *Reasonably believes the protected resident has abandoned or surrendered possession of the property based on a reasonable inquiry into the occupancy status of the property*;
2. Provides notice as provided in subsection (c) of this section; and
3. Receives no responsible communication to that notice within 15 days after the later of posting or mailing the notice as required by subsection (c) of this section.

RP § 7-113(b)(2)(ii) (emphasis added).  Subsection (c) provides the specific notice

requirements that must be satisfied in connection with the nonjudicial self-help eviction.[6]

---

[5]  *See* RP § 7-113(b)(2)(i) ("Except as provided in subparagraph (ii) of this paragraph, a party claiming the right to possession may take possession of residential property from a protected resident only in accordance with a writ of possession issued by a court and executed by a sheriff or constable.").

[6] If the party claiming the right to possession of the residential property "reasonably believes, based on a reasonable inquiry into the occupancy status of the property, that all protected residents have abandoned or surrendered possession of the residential property," the party "may post on the front door of the residential property and mail by first-class mail addressed to 'all occupants'" of the property, a written notice in substantially the following form:

IMPORTANT NOTICE ABOUT EVICTION

A person who claims the right to possess this property believes that this property is abandoned. If you are currently residing in the property, you must immediately contact:

_____
Name

_____
Address

_____
Telephone

_____

19

Subparts (b)(2)(ii) and (c)(1) make it clear that, to avail oneself of the self-help eviction process (and the protection from liability afforded by the statute), the party claiming the right to possession *must* make reasonable inquiry into the status of the property in order to have a reasonable and good faith belief that all protected residents have abandoned or surrendered the property.

    c.  Available Remedies for Violations of the Statute

RP § 7-113(d)(1) sets forth the available remedies for a violation of the statute, providing that "[i]f in any proceeding the court finds that a party claiming the right to possession violated subsection (b) of this section, the protected resident may recover: (i) possession of the property, if no other person resides in the property; (ii) actual damages; and (iii) reasonable attorney's fees and costs." (Paragraph breaks and some capitalization omitted). The statute further provides that "[t]he remedies set forth in this subsection are not exclusive." RP § 7-113(d)(2).

*3. Application of the Statute to the Facts Alleged in the Amended Complaint*

Taking all facts set forth in the amended complaint in the light most favorable to the plaintiffs, the Wheelings and Ms. Rodriguez were protected residents and Selene and its agent, Ms. Gargeu, were parties claiming a right to possession. Although the eviction

---

Date of this notice

> If you do not contact the person listed above within 15 days after the date of this notice, the person claiming possession may consider the property abandoned and seek to secure the property, including changing the locks without a court order.

*See* RP § 7-113(c).

notices included the necessary statutory language contained in subsection (c), neither Selene nor Ms. Gargeu had undertaken a reasonable inquiry into the status of the property to ascertain whether the properties were abandoned or whether the residents had surrendered possession. Accordingly, they cannot take advantage of the safe harbor protections set forth in RP § 7-113(b)(2)(ii) and (c).[7]

The question, therefore, is whether the Wheelings and Ms. Rodriguez have stated a cause of action under the statute where the Respondents' unlawful actions—posting eviction notices without undertaking the necessary reasonable inquiry into the occupancy status of the property—did not cause them to be dispossessed of the property.

The Wheelings and Ms. Rodriguez assert that under the plain language of the statute, subsection (b) prohibits a party claiming the right to possession from "tak[ing] possession" as well as "threaten[ing] to take possession." According to the Wheelings and Ms. Rodriguez, a judicial determination that a defendant engaged in *either* act gives a protected resident the right to recover the remedies available under subsection (d).

---

[7] The dissent erroneously concludes that "RP § 7-113 operated exactly as . . . was intended by the General Assembly because notice was provided to Petitioners and their response to that notice prevented them from being evicted." Dissent Slip Op. at 14. We disagree. Considering all the facts set forth in the amended complaint in the light most favorable to the Wheelings and Ms. Rodriguez, Selene and Ms. Gargeu failed to undertake the necessary "reasonable inquiry" into the occupancy status of the property, thereby necessitating the residents' actions in contacting their attorney to understand their rights. Had Selene and Ms. Gargeu undertaken the required "reasonable inquiry" into the occupancy status of the properties, presumably the eviction notices never would have been posted in the first place. The dissent's conclusion requires that we read out of the statute the "reasonable inquiry" requirement contained in RP § 7-113(b)(2)(ii)(1). In order to avail oneself of the safe harbor provision, a party claiming possession is *required* to undertake a reasonable inquiry prior to posting notice. We will not omit language in the statute in order to reach a different result.

21

On the other hand, Selene and Ms. Gargeu urge us to adopt the interpretation embraced by the Court of Special Appeals—that a statutory cause of action does not extend to persons who "do[] not vacate their properties even if the parties seeking possession violated § 7-113(b) and (c) by not making the required inquiry before posting." *Wheeling*, 246 Md. App. at 279.

We determine that the Court of Special Appeals' interpretation is inconsistent with the plain language of the statute. Subsection (d) of the statute provides a cause of action for a violation of subsection (b). Despite its holding, the intermediate appellate court aptly observed that "[s]ubsection (d) establishes a remedy for violations of 'subsection (b)' and not only for violations of 'subsection (b)(1).'" *Id.* at 278. In other words, under the plain language of the statute, the General Assembly established a remedy for a violation of *both* (b)(1) *and* (b)(2). A party violates subsection (b)(2) when the party attempts to engage in a self-help eviction by posting the statutory notice without undertaking the required "reasonable inquiry into the occupancy status of the property[.]" There is no language in the statute that requires that a protected resident vacate the property as a condition precedent to maintaining an action against a party who violates subsection (b)(2).

Other subsections of the statute support our interpretation. The plain language of RP § 7-113 expressly prohibits the act of taking possession and threatening to take possession: "a party claiming the right to possession may not take possession or threaten to take possession of residential property from a protected resident." RP § 7-113(b)(1). And although the provisions go on to enumerate the ways in which a party may not take possession—*i.e.*, by "[l]ocking the resident out," "engaging in willful diminution of

22

services," or "taking any other action that deprives the protected resident of possession," RP § 7-111(b)(1)(i)-(iii)—it clearly prohibits the threatening of those actions as well.

The Court of Special Appeals' conclusion that a plaintiff must vacate the property to have a cause of action under RP § 7-113 would have the effect of rendering as surplusage the express language prohibiting threats to take possession. Subsection (b)(1) prohibits a variety of conduct, including the claiming party taking *actual possession*, but also *threats to take possession.* Taking possession of property and threatening to take possession of property are two distinct acts. One may threaten action but never consummate the act. Each action is unlawful under the statute. That the General Assembly specifically intended to prohibit each distinct act is bolstered by the fact that it supplied a precise definition to the phrase "threaten to take possession." *See* RP § 7-113(a)(5).[8] We will not interpret a statute in a manner so as to render a "word, clause, sentence, or phrase . . . surplusage, superfluous, meaningless, or nugatory[.]" *Breslin v. Powell*, 421 Md. 266, 287 (2011). If we read the statute as extending protections to only protected residents who are, in fact,

---

[8] Selene and Ms. Gargeu hone in on the word "imminent" in the definition of "threaten to take possession[,]" *see* RP § 7-113(a)(5), ask us to supply a dictionary definition for that word, and conclude that there was no violation of the statute because their eviction notice did not contemplate that eviction was "likely to occur at any moment." Even if we were to determine that the eviction notice did not constitute "a threat[] to take possession" because the action was not "imminent," such an interpretation would not excuse the factual allegation in the amended complaint that they failed to undertake the required reasonable inquiry into the occupancy status of the property prior to posting the notice. *See* RP § 7-113(b)(2)(ii). Regardless, we decline to narrowly interpret the term "imminent" and supply a definition that is inconsistent with the remedial purpose of the statute. *See Lockett v. Blue Bristol, LLC*, 446 Md. 397, 424 (2016).

dispossessed by the claiming party's unlawful acts, it renders the prohibition on "threaten[ing] to take possession" surplusage—a disfavored interpretation.

Nor does our examination of subsection (d) lead us to conclude that the General Assembly intended to limit the protections under the statute only to those protected residents who are displaced by the unlawful conduct of a party claiming the right to possession. If a party claiming possession violates subsection (b), the statute provides a protected resident a variety of non-exclusive remedies, including "(i) possession of the property, if no other person resides in the property; (ii) actual damages; and (iii) reasonable attorney's fees and costs." RP § 7-113(d) (capitalization omitted).[9] We do not interpret

---

[9] Although the dissent pays lip service to the principle that, when undertaking statutory interpretation, we start with the plain language, the dissent's proffered construction ignores this cardinal rule. Instead, the dissent posits that the Court must read "the controlling language in subsection (b), and the statute's legislative history . . . to find that the 'reasonable inquiry' requirement under subparagraph (b)(2)(ii) is not tied to the penalties in subsection (d)." Dissent Slip Op. at 4. The dissent spends approximately fourteen pages explaining its "plain language" analysis of the statute (sprinkled with references to the legislative bill file as evidence of what the dissent contends the Legislature actually intended). Dissent Slip Op. at 2–15. We determine that such interpretive gymnastics are unnecessary, given that the Legislature very plainly and clearly summed up the available remedies for violating the statute in one sentence. Subsection (d) establishes remedies for a "violat[ion] of subsection (b)," plain and simple.

Ignoring the plain and unambiguous language, the dissent supplies its own interpretive gloss to reach an alternative construction. Relying upon various materials in the legislative bill file, such as the deleted preamble contained in the first reader of the bill, emails, and testimony from various proponents and opponents of the bill, the dissent asserts that the General Assembly did not actually intend what it said. *See* Dissent Slip Op. at 50 (explaining that "the language of [RP § 7-113](b)(2)(ii) *suggests* that its requirements, although important, do not have a nexus to the remedies in subsection (d). Where a party seeking the right to possession does not threaten to take possession or actually take possession of real property, the General Assembly *did not intend* for the party in possession to recover under subsection (d)."). (Emphasis added). The dissent's analysis turns our cardinal canon of statutory interpretation on its head. Where a statute

24

the statute's use of the word "and" as *requiring* that the protected resident seek *all* the available remedies in order to recover *any* of them. *See Comptroller of Treasury v. Fairchild Industries, Inc.* 303 Md. 280, 286 (1985) (stating that courts have the authority to construe the word "and" to mean "or" as required by the context in order to comply with the clear legislative intent). Such an interpretation would frustrate "the evils to be remedied by the statutory provision under scrutiny[,]" rather than advance the statute's purpose. *Lockshin*, 412 Md. at 274. For example, there may be situations where a protected resident, who is displaced by the unlawful act of a party claiming possession, incurs damages arising from the unlawful act, but does not wish to repossess the property. Or the protected resident may be unable to obtain possession because the property is occupied by someone else, thereby foreclosing the ability to seek repossession under the statute. *See* RP § 7-113(d)(i). Protected residents who fall within these hypothetical situations should not be denied the

is unambiguous, "[w]e will not divine a legislative intention contrary to the plain language of a statute or judicially insert language to impose exceptions, limitations or restrictions not set forth by the legislature." *Nesbit v. Gov't Employees Ins. Co.*, 382 Md. 65, 75–76 (2004) (cleaned up). Nor will we use legislative history to negate the result that the text would otherwise compel. Indeed, such a "seine net approach to legislative history increases the risk that the court will attribute a purpose to the General Assembly that it never really intended." Jack Schwartz & Amanda Stakem Conn, *The Court of Appeals at the Cocktail Party: The Use and Misuse of Legislative History*, 54 Md. L. Rev. 432, 454 (1995). Moreover, even if we were inclined to review the legislative history to confirm our plain language analysis (as we occasionally, but are not required to, consider where the language is plain and unambiguous), we find nothing in the history cited by the dissent to contradict the plain language.

Respectfully, we are not interpreting the statute "in order to achieve a policy-driven outcome[.]" Dissent Slip Op. at 49. We are simply applying the text as written. To the extent that the General Assembly did not actually intend for the remedies in subsection (d) to apply to a violation of subsection (b)—as reflected in the plain and unambiguous language in the statute—it knows how to correct it.

opportunity to recover actual damages arising from a violation of the statute simply because, for whatever reason, they do not wish to repossess the property, or are otherwise unable to do so. Finally, we conclude that any alternative reading of the word "and," suggesting that the listed remedies are somehow mandatory, is foreclosed by subsection (d)(2), which expressly states that the "remedies set forth in this subsection are not exclusive." Accordingly, we hold that the clear purpose of the list of remedies is to identify the *types* of non-exclusive remedies that are available to a protected resident, rather than to limit recovery only to a subset of protected residents who have been displaced by the unlawful conduct.[10]

In conclusion, we hold that under the plain language of RP § 7-113(d), a protected resident has a statutory cause of action to recover actual damages arising from a violation

---

[10] In concluding that RP § 7-113 only provides a statutory cause of action where the unlawful conduct caused the resident to be dispossessed, the Court of Special Appeals relied upon the canon of statutory interpretation that, where a statute confers a right in derogation of common law, we must strictly construe its terms. *Wheeling v. Selene Finance, LP*, 246 Md. App. 255, 278–79 (2020) (citing *Cosby v. Dept. of Human Resources*, 425 Md. 629, 645 (2012)). The dissent similarly relies upon this canon. Dissent Slip Op. at 51. Although we agree that the statute was enacted in direct response to our holding in *Nickens* (and therefore enacted in derogation of common law), we conclude that the use of this canon to limit the cause of action only to protected residents who suffer from an unlawful dispossession, would conflict with the express language of the statute. We decline to apply this canon to reach a result that would be inconsistent with the plain and unambiguous language of the statute. *See, e.g.*, *Witte v. Azarian*, 369 Md. 518, 533 (2002) (noting that "[m]ost statutes, of course, change the common law, so that principle necessarily bends when there is a clear legislative intent to make a change[]"). We further observe that, not only did the Legislature's enactment of RP § 7-113 overturn our decision in *Nickens*, it also created a private cause of action for violations of the statute. Where a statute provides remedies not available at common law, the statute is remedial in nature, and we liberally construe a remedial statute in order to effectuate its broad remedial purpose. *Lockett v. Blue Ocean Bristol, LLC*, 446 Md. 397, 424 (2016); *Pak v. Hoang*, 378 Md. 315, 326 (2003).

of subsection (b) of the statute regardless of whether the unlawful conduct forced the protected resident to vacate the property. We conclude that the amended complaint adequately alleges a cause of action under RP § 7-113(d).

## B. *Private Cause of Action for a Violation of the MCPA*

We turn to the second cause of action pleaded in the amended complaint—a private cause of action under the MCPA. The purpose of the MCPA is to "set certain minimum standards for the protection of consumers across the State." CL § 13-102(b)(1). In enacting the MCPA, the General Assembly determined that the State "should take strong protective and preventative steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland." CL § 13-102(b)(3). The General Assembly further instructed that the MCPA shall be "construed and applied liberally to promote its purpose." CL § 13-105. To that end, the MCPA prohibits "any unfair, abusive, or deceptive trade practice . . . in . . . [t]he sale, lease [or] rental, . . . of any . . . consumer realty." CL § 13-303(1).

Under the MCPA, "consumer realty" is defined as real property that is "primarily for personal, household, family, or agricultural purposes." CL § 13-101(d). "Consumer" is defined as an "actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, consumer realty, or consumer credit." CL § 13-101(c)(1). Under these definitions, we determine that the Wheelings and Ms. Rodriguez, who leased or owned real property for personal purposes, qualify for protection under the MCPA.

Section 13-303 of the MCPA generally prohibits unfair, abusive, or deceptive trade practices, and § 13-301 of the Act contains a nonexclusive list of practices that are defined

27

to be unfair, abusive, or deceptive. *Golt v. Phillips*, 308 Md. 1, 8–9 (1985). The MCPA prohibits false or misleading oral or written statements that have "the capacity, tendency, or effect of deceiving or misleading consumers." CL § 13-301(1).

The MCPA sets forth provisions for public enforcement, as well as private remedies. Specifically, CL § 13-201 "establishes the Division of Consumer Protection in the Office of the Attorney General, charging the Division with the duty to administer the Consumer Protection Act. The Division has the power and the duty to receive and investigate complaints and to initiate an investigation of any unfair and deceptive trade practice." *Consumer Protection Division v. Morgan*, 387 Md. 125, 149 (2005). In addition to the broad public enforcement powers granted to the Consumer Protection Division, the MCPA also sets forth a private remedy, stating that "any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title." CL § 13-408(a).

"A consumer who has been subjected to an unfair or deceptive trade practice may elect to utilize either the public or private enforcement proceedings available under the [M]CPA or may utilize both public and private enforcement proceedings, either simultaneously or in the alternative." *Citaramanis v. Hallowell*, 328 Md. 142, 151 (1992). We have held that a plaintiff pursuing a private action under the MCPA must prove "actual injury or loss." *Lloyd v. GMC*, 397 Md. 108, 143 (2007); *Citaramanis*, 328 Md. at 153.

In considering the Wheelings' and Ms. Rodriguez's MCPA claims in this case, the Court of Special Appeals reviewed *Lloyd* and *Citaramanis*, and concluded that under these

28

cases, this Court has established a "more demanding standard for pleading damages in private actions brought under the MCPA." *Wheeling*, 248 Md. App. at 282. We examine these cases here, as well as our decision in *Golt v. Phillips*, 308 Md. 1 (1986) (our first case to discuss these issues), to determine whether our jurisprudence establishes a heightened pleading requirement for damages in the context of a private MCPA claim.

In *Golt*, we held that, where the landlord had engaged in unfair and deceptive trade practices in the rental of consumer realty (by renting an unlicensed apartment with housing code violations), the tenant could recover compensatory damages consisting of three months' rent that he had paid for an uninhabitable apartment, as well as consequential damages, such as moving expenses and costs associated with substitute housing for the remainder of the term of the original lease. 308 Md. at 13–14.

In *Citaramanis*, the tenants brought a similar private action under the MCPA against the landlord for renting them an unlicensed apartment. 328 Md. at 145. However, unlike the facts of *Golt*—in which the tenant established that the property was not only unlicensed, but uninhabitable—the tenants in *Citaramanis* did not allege that the property was unclean, unsafe, uninhabitable, or unsuitable in any regard. *Id.* at 149. To the contrary, the tenants' counsel explicitly argued that the condition of the property was irrelevant because the basis of their cause of action was misrepresentation regarding the failure to license, not the condition of the property. *Id.* In fact, the evidence reflected that, at the conclusion of the term of the lease, the tenants elected to extend their tenancy and remain on the premises for another six months after the termination of the original lease at a higher rent. *Id.*

29

We granted *certiorari* to determine whether a tenant who brings a private action under the MCPA may be awarded restitution of rent paid for an unlicensed dwelling upon proving lack of licensure alone. *Id.* at 147. We held that in order to prevail on a private MCPA claim, a plaintiff must prove "actual injury or loss." *Id.* at 151 (quoting CL§ 13-408(a) and *Golt*, 308 Md. at 12). We explained the rationale for the requirement that a plaintiff prove "actual injury or loss," observing that where the plaintiff does not suffer an injury or loss, they may avail themselves of the MCPA's public enforcement remedies. *Id.* at 151–52. We noted that the MCPA's "public enforcement mechanisms are set up to prevent potentially unfair or deceptive trade practices from occurring, even before any consumer is injured, whereas § 13-408(a) requires that actual 'injury or loss' be sustained by a consumer before recovery of damages is permitted in a private cause of action." *Id.* at 153. We stated that "awarding full restitution of the rent paid by the tenants who offered no proof of actual injury or loss would be in the nature of a punitive remedy," serving to penalize the landlords for their failure to obtain a license and to serve as a general deterrent to similar conduct by other landlords generally. *Id.* We explained that CL § 13-408(a) "was not intended to punish the landlord or set an example for similar wrongdoers." *Id.* Accordingly, we held that the plaintiff tenants could only recover on their private MCPA claim against their landlord for deceptive trade practices arising from renting an unlicensed apartment if they could prove that the unlicensed condition caused them to suffer an "actual injury or loss." *Id.* We remanded the case to the trial court for further proceedings "to determine whether the tenants are

30

able to prove that they suffered 'actual injury or loss,' justifying recovery" under CL § 13-408(a). *Id.* at 164.

In *Lloyd v. General Motors Corp.*, 397 Md. 108 (2007), the petitioners brought a class action lawsuit against certain corporations that manufactured automobiles for the cost of repairing and/or replacing the front seats in specific vehicles. The petitioners alleged that the seats were unsafe because they collapsed rearward in moderate and severe rear-impact collisions. *Id.* at 117–18. None of the petitioners, nor any putative class members, alleged that he or she had experienced personal injury as a result of the mechanical failure that caused the alleged defect, and in fact, persons with such experiences were expressly excluded from the case. The seven-count complaint alleged negligent design, strict liability, breach of implied warranty of merchantability, negligent failure to warn, concealment and misrepresentation, fraudulent concealment and intentional failure to warn, unfair and deceptive trade practices under the MCPA, and civil conspiracy. *Id.* at 118. After the petitioners filed suit in the circuit court, the respondents moved, pursuant to Maryland Rule 2-322(b), to dismiss the case for failure to state a claim upon which relief could be granted. *Id.* at 119. The circuit court granted the motion, which was affirmed by the Court of Special Appeals. *Id.* at 120.

We granted *certiorari*, explaining that the main issue in the case was "whether the cost to repair defective seatbacks," allegedly having a "tendency to collapse in rear-impact collisions, causing, in some cases, serious bodily injury or death to drivers and/or passengers in the class vehicles, constitutes a cognizable injury, in the form of economic loss for claims sounding in tort, contract, and consumer protection." *Id.* at 117. Concluding

that the petitioners had "sufficiently alleged an injury that is cognizable under each of the petitioners' claims[,]" we reversed the judgment of the Court of Special Appeals dismissing the petitioners' claims. *Id.*

With respect to the petitioners' MCPA claim, we explained that "actual physical injury to a person or property or actual product malfunction is not required to state a cognizable injury under the [MCPA]" and therefore, we reversed the dismissal of that claim. *Id.* at 140. In considering the nature of the petitioners' allegations, we discussed *Golt* and *Citaramanis*, reiterating the distinction we described in those cases between a public enforcement action under the MCPA for which no consumer injury is required, and a private action under CL § 13-408(a), which requires that the parties "plead actual injury or harm[.]" *Id.* at 148. Because the MCPA requires "actual injury or loss" in order to maintain a private action, whereas a public enforcement action requires no such proof, we stated that "there is a difference between the two options with regard to the necessity of pleading injury or harm:

> 'Section 13-408(a) therefore, requires [an] aggrieved consumer to establish the nature of the actual injury or loss that he or she has allegedly sustained as a result of the prohibited practice. This statutory construction creates a bright line distinction between the public enforcement remedies available under the [MCPA] and the private remedy available under § 13-408(a).'"

*Id.* at 148 (quoting *Citaramanis*, 328 Md. at 151).

Analyzing the complaint, we noted that the petitioners alleged facts constituting "a loss, measured by the amount it will cost them to repair the defective seatbacks." *Id.* at 149. We concluded "that the alleged damages in this case are more like those in *Golt*, in

32

that they constitute no more than the amount it would take to remedy the loss they incurred as a result of the respondents' alleged deceptive trade practices." *Id.* at 150. Accordingly, we held that the petitioners had "set forth sufficient facts of injury or loss to withstand dismissal of the consumer protection claim." *Id.*

Respectfully, our examination of *Golt*, *Citaramanis*, and *Lloyd*, does not lead us to the same conclusion as that reached by the Court of Special Appeals—that our jurisprudence "impos[es] a more demanding standard for pleading in private actions brought under the MCPA." *Wheeling*, 246 Md. App. at 282. We simply construe these cases as requiring that a plaintiff plead "an actual loss or injury" as part of a private MCPA claim. In other words, because "actual loss or injury" is a necessary element to bring a private cause of action under the MCPA, it must be pleaded in the same fashion as would be required in any other cause of action where the plaintiff seeks money damages.

Having determined that the general pleading standard articulated in Maryland Rule 2-302(b) applies to the amended complaint, we turn to the damages to determine whether they have been sufficiently pleaded to withstand a motion to dismiss.

## C.    *Sufficiency of Damages Pleaded*

The amended complaint alleges that, as a result of Selene's unlawful actions, the Wheelings and Ms. Rodriguez suffered two types of damages:  (1) "emotional damages and losses with physical manifestations[;]" and (2) attorney's fees arising from their seeking legal advice to "understand their rights" after receiving the eviction notices.

33

Specific to the Wheelings' claims, the amended complaint alleges that, as a result of Selene's unlawful actions, they

> suffered damages and losses. These included: (i) having to incur legal fees to know their rights as bona fide tenants based upon Selene's unfair and false statements; (ii) emotional damages and losses with physical manifestations such as fear (of losing their home), anxiety (with the threat of eviction through no fault of their own), anger (that Selene could not answer basi[c] questions to them as bona fide tenants), etc.

Turning to Ms. Rodriguez, the amended complaint alleges that she

> suffered damages and losses. These included: (i) she incurred legal fees to know her rights as a former owner of the property based upon Selene's and Gargeu's deceptive eviction threats; (ii) emotional damages and losses with physical manifestations such as fear, anxiety, and anger that she would return home from a medical or other appointment to find her possessions and property taken from her before the dates established by the Sheriff's office even though Selene and Gargeu knew the property was in fact occupied by her.

We consider each category of damages pleaded below.

### 1. Damages for Emotional Distress

In Maryland, a right to recovery exists for emotional distress "if it results in physical injury." *Vance v. Vance*, 286 Md. 490, 494 (1979). We described the history and rationale of the physical injury requirement in *Vance*, which we again summarized in *Hoffman v. Stamper*, 385 Md. 1, 33–38 (2005). It is useful to briefly repeat the history and the evolution of this Court's standard here.

In *Vance*, we observed that "[u]nder the traditional rule, formulated in the nineteenth century, courts did not recognize a duty to refrain from the negligent infliction of emotional distress and therefore recovery of damages solely for mental distress was not permitted." 286 Md. at 496. We noted that under the traditional rule, "damages for mental distress had

34

a parasitic status; recovery was dependent upon an immediate physical injury accompanying an independently actionable tort." *Id.* We explained that, over time, courts generally, and this Court in particular, began to modify the accompanying "physical impact" rule because it led to inconsistent results. *Id.* at 497. In *Green v. Shoemaker*, 111 Md. 69 (1909), we rejected the physical impact rule, and adopted what was later characterized as the "modern rule" which permitted recovery for negligent infliction of emotional distress if a "physical injury" resulted from the commission of a tort, regardless of impact. *Vance*, 385 Md. at 497.

In *Hoffman*, we explained the rationale for the adoption of the modern rule, which allows for the recovery of damages for emotional distress if there is at least a "consequential" physical injury:

> Although courts were not averse to eliminating the requirement of an accompanying physical impact, they were reluctant to eliminate entirely the requirement of some consequential physical injury as a condition to the award of damages for emotional or mental distress. There still remained concern that mental distress may be too easily simulated and that there was no practical standard for measuring such distress; thus, recovery for emotional injury would not be allowed based on the plaintiff simply saying, "This made me feel bad; this upset me." The "modern rule," allowing recovery of damages for emotional distress if there was at least a "consequential" physical injury, we regarded as the proper balance—a "sufficient guarantee of genuineness that would otherwise be absent in a claim for mental distress alone."

*Hoffman*, 385 Md. at 34 (quoting *Vance*, 286 Md. at 498). We explained that the modern rule simply applied the same rule to emotional injuries that applies to other types of injuries—that is, "recovery could be had if the injury was objectively ascertainable and was shown to be a provable consequence of the wrongful conduct." *Id.*

35

We also explained that in *Vance*, the "rule itself underwent a significant expansion when we gave an elastic definition to the word 'physical.'" *Id.* Specifically, "for purposes of applying the 'modern rule,' the term 'physical' was not used in its ordinary dictionary sense, but instead 'is used to represent that the injury for which recovery is sought is capable of objective determination.'" *Id.* (quoting *Vance*, 286 Md. at 500). Under this standard, we observed that the physical injury accompanying the emotional injury "had been held to include such things as depression, inability to work or perform household chores, loss of appetite, insomnia, nightmares, loss of weight, extreme nervousness and irritability, withdrawal from socialization, fainting, chest pains, headaches, and upset stomachs." *Id.* at 34–35 (citing *Vance*, 286 Md. at 501). We stated that, examined analytically, the accompanying physical injury "had more to do with *proving*, rather than defining, this kind of injury." *Id.* at 35 (citing *Belcher v. T. Rowe Price*, 329 Md. 709 (1993); *Faya v. Almaraz*, 329 Md. 435 (1993); *Smith v. Borello*, 370 Md. 227 (2002)) (emphasis added).

In *Vance*, one of the questions was whether, under the "physical injury" test, damages may be recovered for emotional distress resulting from a negligent misrepresentation. 286 Md. at 492. In that case, Mrs. Vance sued Mr. Vance for negligent misrepresentation. Mr. and Mrs. Vance were married for twenty years and had two children. *Id.* After Mr. Vance left Mrs. Vance for another woman, Mrs. Vance sought an order for alimony and child support. Mr. Vance opposed the relief on the ground that he had not been divorced from his first wife prior to his marriage to Mrs. Vance, and therefore, their marriage was a nullity. *Id.* Mr. Vance had never disclosed to Mrs. Vance that he was

36

not divorced from his first wife at the time of their marriage, and she did not discover this fact until Mr. Vance sought to annul the marriage twenty years later. *Id.* Mrs. Vance filed a suit against Mr. Vance seeking, among other things, damages for emotional distress resulting from Mr. Vance's negligent misrepresentation.

The evidence at trial was that the disclosure of the fact that her twenty-year marriage was void had a devastating effect on Mrs. Vance:

> She went into a state of shock, engaged in spontaneous crying and for a period deemed detached and unaware of her own presence. She was unable to function normally, unable to sleep and too embarrassed to socialize. In addition to experiencing symptoms of an ulcer, [Mrs. Vance] suffered an emotional collapse and depression which manifested itself in her external condition, *i.e.*, her significantly deteriorated physical appearance—unkempt hair, sunken cheeks and dark eyes.

*Id.* at 501. We held that this evidence was "legally sufficient to establish symptoms of a mental state evidencing a physical injury" within the meaning of the modern rule. *Id.*

In *Hoffman*, we had an opportunity to consider whether a plaintiff could recover emotional damages in the context of an action alleging fraud and violations of the MCPA. 385 Md. at 1. In that case, nine purchasers brought an action against several defendants, including a vendor, mortgage lender, loan officer, and appraiser, alleging fraud, conspiracy to defraud and violations of the MCPA in connection with an elaborate property flipping scheme. *Id.* at 7–8. The plaintiffs alleged that the vendor: (1) purchased dilapidated properties in Baltimore City at low prices, then searched for unsophisticated, low-income buyers with poor credit histories; (2) promised them that he could sell them a renovated home for a down payment of only $500; (3) got buyers to sign contracts of sale at significantly inflated prices upon a promise to make extensive repairs, many of

37

which were never made; (4) arranged for the buyers to finance the purchase with loans obtained through the defendant mortgage lender; (5) secured the loans using grossly inflated appraisals prepared by the defendant appraiser, all in violation of federal regulations regarding Federal Housing Administration (FHA) loans. *Id.* at 9. After taking possession, the plaintiffs experienced major problems with their homes, some of which were uninhabitable. Six of the nine plaintiffs eventually lost their homes to foreclosure. *Id.* A jury found each of the defendants liable to each of the plaintiffs for fraud, conspiracy to defraud, and violations of the MCPA. *Id.* at 7. The jury awarded each plaintiff, as against all the defendants, different amounts of economic damages, and $145,000 for non-economic (emotional damages). *Id.* Although each of the plaintiffs was awarded non-economic damages for emotional injuries, only one plaintiff testified about any physical manifestations of those emotions. *Id.* at 32. Specifically, other than plaintiff Haley, all of the plaintiffs testified that the "problems they encountered with their homes caused them emotional distress—sadness, anger, humiliation, embarrassment [and] stress[.]" *Id.* Haley, who died prior to trial, was the only plaintiff who described any physical manifestations associated with his emotional injuries, stating at his deposition that, whenever he began thinking about his problems, he would get headaches and would vomit. *Id.* at 33. Haley also admitted that he was a diabetic and was required to have kidney dialysis three days a week and that those conditions were not caused by the stress associated with the problems with his house. *Id.*

On appeal, the Court of Special Appeals upheld the non-economic damages awards to all of the plaintiffs, after concluding that the physical injury rule was not applicable to

intentional torts such as fraud. We granted *certiorari* to consider, among other issues, whether the Court of Special Appeals erred in holding that, in an action based on fraud, damages for emotional injuries may be awarded in the absence of any physical injury. *Id.* at 8. After recounting the history and rationale of the physical injury rule in the context of negligence cases, we held that the Court of Special Appeals erred in excusing the plaintiffs in a fraud case from having to show some physical manifestation as a condition to recovery of damages for purely emotional injury:

> We see no reason to create an exception for fraud cases to the carefully crafted rule enunciated in *Vance* and the subsequent cases. It is consistent with the more liberal approach adopted by other courts; it remains a fair balance that permits recovery of damages for emotional injury which, by reason of either an accompanying or consequential "physical" injury, is objectively ascertainable; and it avoids the dilemma of requiring some physical manifestation where the misrepresentation is negligent but not where it is deliberate, even though the consequences to the plaintiff may be precisely the same.

*Id.* at 38. We determined that "[b]ecause eight of the plaintiffs offered no evidence of any physical manifestation of their claimed emotional stress, the defense motions on that issue should have been granted" and that the "uniform $145,000 awards to them must be stricken." *Id.* However, we noted that because the plaintiff Haley "*did* present sufficient evidence of some physical manifestation, an award of non-economic damages to him would be possible under a correct jury instruction." *Id.* In remanding the case for further proceedings concerning Mr. Haley's non-economic damages, we stated that, given Haley's death prior to trial, "[w]hether his estate can still or might desire to pursue a trial on that issue we cannot determine, but we shall not foreclose it." *Id.*

39

Applying the above principles to the amended complaint and considering the pleading in the light most favorable to the Petitioners, we conclude that the Wheelings and Ms. Rodriguez have sufficiently pleaded damages for emotional injury. As noted above, in order to maintain a private cause of action under the MCPA, the plaintiff must allege an "actual injury or loss." *Lloyd*, 397 Md. at 143; CL § 13-408(a). In order to recover damages for emotional injury, they must be accompanied by a physical injury, which the plaintiff will be required to prove by some objective physical manifestation. *See Hoffman*, 385 Md. at 39; *Vance*, 286 Md. at 500. Here, the Wheelings and Ms. Rodriguez have alleged that Selene's unlawful act of posting eviction notices, without undertaking the required "reasonable inquiry" to determine whether the property had been abandoned, caused them to suffer "emotional damages and losses with physical manifestations. . . . " Although the plaintiffs will be required to *prove* that their emotional injuries are accompanied by physical injuries that are capable of objective determination, the specifics of such objective manifestations have "more to do with *proving*, rather than defining, this kind of injury." *Hoffman*, 385 Md. at 35 (emphasis added). We note, however, that *pleading* emotional damages with physical manifestations is a much different hurdle than *proving* the same. Our holding should not be construed as altering the standard for proving such physical injuries as articulated in *Hoffman* and *Vance*.[11]

---

[11] We are mindful that the amended complaint alleges "emotional damages and losses with physical manifestations *such as fear, anxiety and anger . . . .*" We reiterate that under *Vance* and *Hoffman*, emotional injuries must be accompanied by a *physical* injury that is objectively ascertainable. In other words, the Petitioners' testimony that "[t]his made me feel bad; [or] this upset me" would not suffice. *See Hoffman v. Stamper*, 385 Md. 1, 34 (2005) (quoting *Vance v. Vance*, 286 Md. 490, 498 (2005)).

## 2. *Attorney's Fees as Actual Damages*

Finally, we turn to the second component of the Wheelings' and Ms. Rodriguez's damages claim—attorney's fees that they incurred to "know their rights" resulting from the unlawful posting of the eviction notices. Distinct from the statutory attorney's fees that may be recovered for litigation expenses,[12] these pre-litigation attorney's fees are sought as separate compensatory damages, which are governed by common law principles applicable to recovery of attorney's fees generally.

Any consideration of the common law standard for awarding attorney's fees begins with the prevailing rule in this country, known as the "American Rule," which prohibits the prevailing party in a lawsuit from recovery his or her attorney's fees as an element of damages. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975); *St. Luke Evangelical Lutheran Church, Inc. v. Smith*, 318 Md. 337, 344 (1990) (tracing the history of the American Rule). In Maryland, our jurisprudence follows the American Rule with a few exceptions. *Eastern Shore Title Co. v. Ochse*, 453 Md. 303, 330 (2017); *Collier v. MD-Individual Practice Ass'n*, 327 Md. 1, 11 (1992) ("In Maryland, the general rule is that costs and expenses of litigation, other than the usual and ordinary court costs, are not recoverable in an action for compensatory damages.") (Cleaned up).

---

[12] Under both statutory causes of action, the prevailing plaintiff is entitled to recover his or her reasonable attorney's fees by statute. *See* RP § 7-113(d)(1) ("If in any proceeding the court finds that a party claiming the right to possession violated subsection (b) of this section, the protected resident may recover . . . (iii) reasonable attorney's fees and costs."); CL § 13-408(b) ("Any person who brings an action to recover for injury or loss under this section and who is awarded damages may also seek, and the court may award, reasonable attorney's fees.").

In *Ochse*, we identified four Maryland exceptions to the American Rule, where attorney's fees are permitted as compensatory damages:[13] (1) where a statute allows for the imposition of such fees; (2) where parties to a contract have an agreement regarding attorney's fees; (3) where the wrongful conduct of a defendant forces a plaintiff into litigation with a third party; and (4) by a plaintiff in a malicious prosecution action for the recovery of damages arising from the defense of the criminal charge. 453 Md. at 330; *see also Hess Constr. Co. v. Bd. of Educ.*, 341 Md. 155, 160 (1996) (noting that "exceptions are quite rare under Maryland common law to the general rule that counsel fees, incurred by the prevailing party in the very litigation in which that party prevailed, are not recoverable as compensatory damages against the losing party").

To support their assertion that they are entitled to recover attorney's fees as compensatory damages, the Wheelings and Ms. Rodriguez primarily rely upon case law permitting the award of attorney's fees under category 3 above. This exception, commonly known as the "collateral litigation doctrine," permits a party to recover attorney's fees actually incurred "when the wrongful conduct of a defendant forces a plaintiff into litigation with a third party." *Smith*, 318 Md. at 346. In *Ochse*, we explained that "the collateral litigation doctrine permits the court to award as damages the legal fees from the separate litigation." 453 Md. at 333 (citing *Empire Realty Co. v. Fleisher*, 269 Md. 278, 286 (1973)). Although we have commonly referred to the collateral litigation

---

[13] *Compare St. Luke Evangelical Lutheran Church, Inc. v. Smith*, 318 Md. 337 (1990) (permitting counsel fees of a prevailing party to be considered where punitive damages may be awarded).

doctrine as an exception to the American Rule, in *Ochse*, we quoted the Supreme Court of Colorado explaining that the doctrine is actually "an acknowledgement that the litigation costs incurred by a party in separate litigation may sometimes be an appropriate measure of compensatory damages against another party." *Ochse*, 453 Md. at 334 (quoting *Rocky Mountain Festivals, Inc. v. Parsons Corp.*, 242 P.3d 1067, 1071 (Colo. 2010)).

In Maryland, we first explained this doctrine in *McGaw v. Acker, Merrall & Condit, Co.* as follows:

> The general rule is that costs and expenses of litigation, other than the usual and ordinary court costs, are not recoverable in an action for damages, nor are such costs even recoverable in a subsequent action; but, where the wrongful acts of the defendant have involved the plaintiff in litigation with others, or placed him in such relations with others as make it necessary to incur expense to protect his interest, such costs and expense should be treated as the legal consequences of the original wrongful act.

111 Md. 153, 160 (1909). The Wheelings and Ms. Rodriguez rely upon the above-quoted language in *McGaw*, as well as subsequent cases that applied the collateral litigation doctrine, to support their argument that they can recover as separate damages, their attorney's fees incurred to "know their rights." *McGaw*, 111 Md. 153; *Ochse*, 453 Md. 303; *Montgomery Vill. Assocs. v. Mark*, 95 Md. App. 337 (1993); *Tully v. Dasher*, 250 Md. 424, 441–42 (1968). However, these cases are distinguishable from the facts alleged by the Wheelings and Ms. Rodriguez in their amended complaint. In contrast to the facts pleaded in this case, each of those cases involved unlawful conduct by a defendant that forced the plaintiff to incur legal expenses in separate litigation, or to protect his or her interest *vis-à-vis* a *third party*. For example, in *McGaw*, the Court permitted the plaintiff

43

to recover attorney's fees incurred to secure a new lease with a third party after the defendant (who was the plaintiff's agent and manager) failed to renew the lease in his employer's name, and instead wrongfully renewed it in his own name. 111 Md. at 161. In other words, the defendant's wrongful actions "*placed [the plaintiff] in such relations with others* as [to] make it necessary to incur expense to protect his interest . . . ." *Id.* at 163 (emphasis added). In *Ochse*, 453 Md. at 331, this Court held that, under the collateral litigation doctrine, the plaintiffs were entitled to recover their attorney's fees as compensatory damages against a defendant title company in a negligence action, where the plaintiffs had incurred the attorney's fees in separate litigation with a third-party property owner to resolve a title dispute that the plaintiffs contended was the result of the title company's negligence. Similarly, in *Montgomery Village Associates*, the Court of Special Appeals applied the collateral litigation doctrine to permit the plaintiffs to recover their legal fees incurred in connection with a bankruptcy proceeding, where the defendants wrongfully failed to perform under a repurchase agreement for a condominium unit, which caused the plaintiff to seek bankruptcy protection after the deed of trust matured on the property, thereby necessitating the need to file bankruptcy as the only alternative to avoid foreclosure with the third-party lender, and in order to preserve the plaintiff's right of specific performance against the defendant. 95 Md. App. at 342. In *Tully*, this Court held that, in a malicious prosecution case, the plaintiffs were entitled to recover as compensatory damages, against the defendants, the attorney's fees that they incurred in connection with the defense of the wrongful criminal charges. 250 Md. at 424.

Indeed, since our articulation in *McGaw* of the Maryland common law exception to the American Rule known as the "collateral litigation doctrine," the plaintiff's recovery of attorney's fees as compensatory damages has been limited to instances where the defendant's wrongful conduct forced a plaintiff into collateral litigation involving a party other than the defendant. This limitation to the doctrine has a sound justification—attorney's fees that are incurred in collateral litigation with a third party to protect one's interest can be objectively quantified and demonstrated to be the natural and proximate consequence of the wrongful act, and incurred necessarily and in good faith, and in a reasonable amount. *See Fowler v. Benton*, 245 Md. 540, 550 (1967). By contrast, where attorney's fees are incurred in connection with a consultation that ultimately results in the filing of a private MCPA claim, it would be difficult, if not impossible (given the shroud of secrecy created by the attorney-client privilege), to discern the fine line between a plaintiff consulting with an attorney to "know his rights" as opposed to a slightly different conversation with counsel "to evaluate a claim." We determine that an application of the collateral litigation doctrine in this instance would simply rove too far. Accordingly, we decline to expand the common law doctrine to permit the plaintiffs to allege, as compensatory damages, their attorney's fees incurred to consult with an attorney to understand their rights where the alleged wrongful conduct alleged did not force them into collateral litigation or require that they incur legal expense to protect their interests in relation to other third parties.

## III.

## Conclusion

Petitioners' amended complaint adequately sets forth a cause of action under RP § 7-113. The statute does not require that a protected resident be deprived of actual possession as a condition to bringing a private cause of action. The Petitioners' amended complaint adequately sets forth a cause of action under the MCPA. Under Maryland's liberal pleadings standard, the Petitioners' amended complaint alleges that Petitioners suffered "emotional damages and losses with physical manifestations." Although the emotional injury damages pleaded in the amended complaint are sparse, they supply the minimum necessary to state a claim. We affirm the judgment of the Court of Special Appeals, however, concerning the Petitioners' assertion that they are entitled to their attorney's fees for consulting an attorney prior to commencing litigation as separate compensable damages. We decline to expand our collateral litigation exception to the American Rule (prohibiting the recovery of attorney's fees as separate damages) to situations where the attorney's fees were not incurred in separate litigation with a third party, or otherwise incurred to protect an interest *vis-à-vis* a third party.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART, AND CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.**

46

Circuit Court for Baltimore City
Case No. 24-C-17-000996
Argued: January 5, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 27

September Term, 2020

WHITNEY WHEELING, ET AL.

V.

SELENE FINANCE LP, ET AL.

Barbera, C.J.,
McDonald
Watts
Hotten
Getty
Booth
Harrell, Glenn T., Jr.
    (Senior Judge, Specially Assigned)
        JJ.

Concurring and Dissenting Opinion
by Getty, J.,
which Hotten, J., joins.

Filed: April 30, 2021

> "Laws, like sausages, cease to inspire respect in proportion as we know how they are made."
>
> John Godfrey Saxe[1]

Respectfully, I dissent. Given the facts here, I would find that the "reasonable inquiry" provision under Md. Code (1974, 2015 Repl. Vol.), Real Prop. ("RP") § 7-113(b)(2)(ii) is a statutory exception and does not provide a cause of action under subsection (d) of the statute. My dissent will focus on this section of the Majority's opinion because this is the Court's first opportunity to address § 7-113 of the Real Property Article after its enactment by the General Assembly during the 2013 legislative session.

I concur with the Majority's analysis that the American Rule prevails in this case and the Petitioners are not entitled to attorney's fees.

However, I also dissent from the Majority and would affirm the holding by the Court of Special Appeals that the Petitioners did not sufficiently plead their damages in a private cause of action under the Maryland Consumer Protection Act. I would adopt the perceptive and succinct analysis of Judge Christopher B. Kehoe in his well-written opinion and feel no need to further elaborate on that issue in this dissent.

During the 2013 legislative session, the General Assembly responded with outrage in opposition to this Court's opinion in *Nickens v. Mount Vernon Realty Group*, 429 Md. 53 (2012). Cross-filed bills were introduced in the Senate and the House of Delegates to repeal the English common law rule of nonjudicial self-help evictions. After committee

---

[1] John Godfrey Saxe (1811-1887) was a Vermont attorney and poet.

hearings and amendments, the General Assembly passed Senate Bill 642 and House Bill 1308 to end the use of self-help evictions. Senate Bill 642, 2013 Leg., 433rd Sess. (Md. 2013); House Bill 1308, 2013 Leg., 433rd Sess. (Md. 2013). Governor Martin O'Malley signed both bills into law and Senate Bill 642 became chapter 514 and House Bill 1308 became chapter 515.[2]

At issue in this case is the statutory interpretation of an amendment added to the first reader House and Senate bills after the legislative committee hearings. This committee amendment clarifies a pre-existing exception in the original bill language that preserves the nonjudicial self-help rule if the property is abandoned (the "abandonment safe harbor amendment"). At issue is the provision in the amendment allowing a person claiming the right to possession of a residential property to, without a court order, use the nonjudicial self-help eviction process if the person "[r]easonably believes the protected resident has abandoned or surrendered possession of the property based on a reasonable inquiry into the

_____

[2] When two bills are cross-filed in the General Assembly and both pass in the House of Delegates and the Senate, the Governor has the choice to sign only one bill or both. Traditionally, it has been good legislative practice to only sign one bill. This is done for several reasons, such as to not clutter the chapter laws with redundancy, to preserve resources of staff time and printing (the printed Laws of Maryland for each legislative session would be almost double in size, print, and paper due to the large number of cross-filed bills), and to avoid legal confusion if, during the bill drafting and amendment process, the two bills end up being not truly identical word-for-word. The only reason to sign both involves the pride of the primary sponsors who each want the benefit of having the Governor sign their bill. When both cross-filed bills are signed by the Governor in succession, the first bill is superseded by the second bill. In this case, Senate Bill 642 was signed into law first (2013 Md. Laws, ch. 514) and was superseded when House Bill 1308 was subsequently the next bill signed into law (2013 Md. Laws, ch. 515). Hereinafter, I only reference House Bill 1308 or chapter 515.

occupancy status of the property" (the "reasonable inquiry" provision) and complies with a newly-created notice provision under the amendment as provided for in subsection (c) of the committee amendments.[3]

This exception for cases of abandonment was broadly worded in the language of the original bill. In clarifying what it means for a property to be abandoned, a safe harbor notice provision was added to the bill with qualifying language requiring a "reasonable inquiry" into the occupancy status of the property. It is clear that this abandonment safe harbor amendment was inserted into the center of the bill's original language without a reciprocating change to the prohibited acts preceding it or to the remedies following it that are tied directly to the prohibited acts.

The questions before the Court are: Do the remedies as originally drafted now apply for the failure to make a "reasonable inquiry?" Or, as the circuit court judge found, do the remedies not apply and the Wheeling and Rodriquez pleadings fail to state a claim upon which relief can be granted?

*A.*      *Competing Interpretations of the Statute's Plain Language.*

The Majority answers "yes" to the first question by focusing on the opening phrase in subsection (d), which reads: "If in any proceeding the court finds that a party claiming the right to possession violated subsection (b) of this section, the protected resident may recover[.]" I reject this interpretation and instead argue that the controlling language of the

---

[3] For ease of reading and clarity, I refer to the subsections and subparagraphs of the bill and statute directly as such—*i.e.*, "subsection (c)" or "subparagraph (b)(2)(ii)"—instead of providing the full citation of RP § 7-113. To be clear, any reference to a "subsection" or "subparagraph" in this opinion refers to paragraphs of House Bill 1308 or to RP § 7-113.

statute is the opening phrase in subsection (b), which states: "Except as provided in paragraph (2) of this subsection[.]" This controlling phrase creates a statutory exception in the structure of subsection (b) and only allows a party to recover under subsection (d) if they violated subsection (b)(1), *i.e.*, they are dispossessed of the property or threatened with imminent eviction.

By relying on the subsection (d) language, the Majority finds in the statute a penalty if one does not make a "reasonable inquiry" even though no such penalty or remedy was stated in the proposed amendments that were adopted by the legislative committees. Thus, they interpret the remedies in the bill prior to the addition of the abandonment safe harbor amendment as applicable for the failure to make a "reasonable inquiry" even though that provision is a statutory exception to the prohibited acts.

Unlike the Majority, I believe that the controlling language in subsection (b), and the statute's legislative history, require the Court to find that the "reasonable inquiry" requirement under subparagraph (b)(2)(ii) is not tied to the penalties in subsection (d). The structure of subsection (b)(2) places the "reasonable inquiry" provision as part of the exceptions to the prohibited acts and thus not subject to the subsection (d) remedies.

The best way to analyze RP § 7-113 is by looking independently at the four component parts that appear after the definitions. Once we analyze the language within each subsection, we then view the statute's overall structure and the interrelationship between each section. The four component parts are:

1. The prohibited acts in subsection (b)(1).

2. The exceptions to the prohibited acts in subsection (b)(2).

4

3. The statutory form notice in subsection (c).

4. The remedies in subsection (d).

*1. The Majority Fails to Give Effect to the Statutory Exception Created by the General Assembly in Subsection (b).*

The Majority ignores the plain language of subsection (b) by incorrectly blending subsections (b)(1) and (b)(2) together as if they are identical. *See* Maj. Slip Op. at 22 ("[U]nder the plain language of the statute, the General Assembly established a remedy for a violation of *both* (b)(1) *and* (b)(2). A party violates subsection (b)(2) when the party attempts to engage in a self-help eviction by posting the statutory notice without undertaking the required 'reasonable inquiry into the occupancy status of the property[.]'" (emphasis and alteration in original)). Such an interpretation fails to acknowledge the language of the statutory exception created by the plain language in this section.

Subsection (b) is divided into two parts: (b)(1) contains the prohibited acts and (b)(2) contains exceptions to the prohibited acts. First, subsection (b)(1) provides that a party seeking the right to possession cannot take possession of property or threaten to take possession by lockouts, willful diminutions of services, or other actions that deprive actual possession:

> (b)(1) Except as provided in paragraph (2) of this subsection, a party claiming the right to possession may not **take possession** or **threaten to take possession** of residential property from a protected resident by:
> (i) Locking the resident out of the residential property;
> (ii) Engaging in willful diminution of services to the protected resident; or
> (iii) Taking any other action that deprives the protected resident of actual possession.

RP § 7-113(b)(1) (emphasis added).

5

From the outset, it is critical to understand the definition of the "threaten to take possession" in this section. As a result of the testimony before the legislative committee, a definition was added to House Bill 1308 as part of the committee amendments. The focus of the definition is the use of the word "imminent" to always qualify the word "threat" throughout RP §7-113 as intending "to take imminent possession of residential property[.]" The full definition reads as follows:

> "Threaten to take possession" means using words or actions intended to convince a reasonable person that a party claiming the right to possession intends to take imminent possession of residential property in violation of this section.

RP § 7-113 (a)(5).

After describing the prohibited acts in subsection (b)(1), two exceptions are provided for in subsection (b)(2). The first exception is when a court proceeding is undertaken resulting in a writ of possession. The second exception details how a party may take possession of a property using nonjudicial self-help under the abandonment safe harbor amendment:

> (b)(2)(i) Except as provided in subparagraph (ii) of this paragraph, a party claiming the right to possession may take possession of residential property from a protected resident only in accordance with a writ of possession issued by a court and executed by a sheriff or constable.
> (ii) A party claiming the right to possession of residential property may use nonjudicial self-help to take possession of the property, if the party:
> > 1. Reasonably believes the protected resident has abandoned or surrendered possession of the property based on a reasonable inquiry into the occupancy status of the property;
> > 2. Provides notice as provided in subsection (c) of this section; and
> > 3. Receives no responsive communication to that notice within 15 days after the later of posting or mailing the notice as required by subsection (c) of this section.

6

RP § 7-113(b)(2).

The Majority wants to interpret the "reasonable inquiry" provision of subparagraph (b)(2)(ii)(1) as being surplusage unless the remedies are applied to the entirety of subsection (b). But that interpretation fails to understand the structure of the statute and the impact of the opening phrase in subsection (b)(1) ("Except as provided in paragraph (2) of this subsection") that carves out subsection (b)(2) as an exception to the prohibited acts.

In interpreting the text of a statute, this Court "read[s] 'the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.'" *Johnson v. State,* 467 Md. 362, 372 (2020) (quoting *Phillips v. State*, 451 Md. 180, 196–97 (2017)). Subparagraph (b)(2)(i) begins: "Except as provided in subparagraph (ii) of this paragraph, a party claiming the right to possession may take possession of residential property . . . ."

Prior to the adoption of the committee amendments, the first reader of House Bill 1308 contained a broadly worded exception for nonjudicial self-help to still apply when a property was abandoned. As a statutory exception, the language clarifies when a party seeking the right to possession can use nonjudicial self-help without violating the prohibited acts in subsection (b)(1) and without being subject to the remedies in subsection (d). *See Statutory Exception*, Black's Law Dictionary (11th ed. 2019) (defining "statutory exception" as "[a] provision in a statute exempting certain persons or conduct from the statute's operation").

7

The broadly worded exception was changed with qualifying language to conduct a "reasonable inquiry" in direct response to the concerns of various property owners' groups at the bill hearings. But the committee amendment did not change the nature of this provision as a statutory exception to the prohibited acts delineated in (b)(1). Instead, the "reasonable inquiry" language is specific to the safe harbor created by the General Assembly for property owners. In enacting the compromise language agreed upon by the opponents and proponents of House Bill 1308, the General Assembly intended to clearly delineate when a party could legally take possession of property from a protected resident under the abandonment safe harbor exception.

The third component part is subsection (c), which provides the mechanics of the safe harbor with the process and wording of the statutory form notice. Under subsection (c), if a party claiming the right to possession seeks to use self-help on an abandoned property, they are required to (1) mail "all occupants" of the property written notice of potential eviction; and (2) post written notice of potential eviction on the front door of the property. RP § 7-113(c)(1). The statutory form notice required by subsection (c)(1) lets the party or parties in possession know that the party claiming the right to possession considers the property abandoned. All the party or parties in possession are required to do under the statute to avoid eviction is call the phone number provided on the notice. The notice provision set out in subsection (c), which is a requirement created by subparagraph (b)(2)(ii), indicates that these provisions were added to protect residents from eviction while avoiding confusion for parties seeking the right to possess a potentially abandoned property.

8

Now that we have analyzed the plain language meaning and structure of the provisions in subsections (b) and (c), we must reconcile how they interact with the fourth component part, the remedies in subsection (d). Subsection (d) provides:

> (d)(1) If in any proceeding the court finds that a party claiming the right to possession violated subsection (b) of this section, the protected resident may recover:
> (i) Possession of the property, if no other person then resides in the property;
> (ii) Actual damages; and
> (iii) Reasonable attorney's fees and costs.
> (2) The remedies set forth in this subsection are not exclusive.

RP § 7-113(d)(1), (2).

The Majority correctly points out that, at face value, the remedies in subsection (d) appear to be tied to both subsections (b)(1) and (b)(2). However, the statute's structure makes it clear that the remedies—which all relate to the repossession of the property for a protected resident who was dispossessed—apply to the lockouts, willful diminutions of services, and other actions that deprive actual possession in violation of subsection (b)(1).

It is also clear that had the qualifying "reasonable inquiry" language not been added by the committee amendments, nonjudicial self-help evictions would have been a total exception to the remedies if the property was abandoned. The question is whether the addition of the "reasonable inquiry" language dismantles the exception or whether it is separately part of a safe harbor for clarifying when a property is abandoned.

> 2. *The Majority Improperly Reads Subparagraph (b)(2)(ii) as the Elements of a Separate Cause of Action, but That Provision Was Added as a Safe Harbor to Clearly Indicate when a Property Is Abandoned.*

The requirement that a party seeking the right to possession undertake a "reasonable inquiry" before using nonjudicial self-help on an abandoned property does not create a separate cause of action under subsection (d). Rather, subparagraph (b)(2)(ii), which includes the "reasonable inquiry" requirement, is a safe harbor provision that sets out the elements of an affirmative defense when a party seeking the right to possession is accused of improperly conducting a nonjudicial eviction or taking other actions that deprive actual possession. Based on the plain language and legislative history, subparagraph (b)(2)(ii) does not set out the elements of a separate cause of action that entitles a plaintiff to the remedies in subsection (d).

The General Assembly certainly intended for parties to adhere to the requirements set out in subparagraph (b)(2)(ii). However, the committee amendments retained the exception language in (b)(1) and thus the structure of the statute indicates that the failure to conduct a "reasonable inquiry" is not an element of a separate cause of action under subsection (d). In dismissing Petitioners' amended complaint, the circuit court judge correctly read the statute's plain language and determined that Respondents' actions, under subparagraph (b)(2)(ii), were "as a matter of law, in conformity with the required notice[.]" *Wheeling v. Selene Finance LP*, No. 24-C-17-000996, (Balt. City Cir. Ct. Nov. 28, 2017) (order granting Defendant Gina Gargeu's motion to dismiss).

The circuit court judge did so because the plain language of the statute indicates the intent of the General Assembly in enacting RP § 7-113—to abrogate the common law by "prohibiting a party claiming the right to possession from taking possession or threatening

10

to take possession of residential property from . . . certain protected resident[s]." House Bill 1308, 2013 Leg., 433rd Sess. (Md. 2013); *see* 2013 Md. Laws, ch. 515.

The primary goal of this Court's statutory interpretation analysis is to ascertain the intent of the legislature. *Chow v. State*, 393 Md. 431, 443 (2006) (citation omitted). This Court defers to the policy objectives enacted into law by the General Assembly and "assume[s] that the legislature's intent is expressed in the statutory language[.]" *Johnson*, 467 Md. at 371 (quoting *Blackstone v. Sharma*, 461 Md. 87, 113 (2018)). Therefore, this Court's "statutory interpretation focuses primarily on the language of the statute to determine the purpose and intent of the General Assembly." *Id.*

The plain language of RP § 7-113 demonstrates that subparagraph (b)(2)(ii) provides a safe harbor and outlines a clear process for repossessing real property without receiving a writ of possession. When a party takes possession of real property by using nonjudicial self-help, and does not have a writ of possession, the remedies in subsection (d) do not apply *unless* the requirements of the safe harbor provision are not met. Contrary to the Majority's holding, and unlike subsection (b)(1), the safe harbor provision does not set out a list of prohibited acts that entitle a plaintiff to the cause of action enumerated in subsection (d).

An illustrative example is helpful in demonstrating how this provision operates. Imagine a trial in which a plaintiff contends that their landlord improperly used a nonjudicial self-help eviction based upon abandonment of the property. Under the statute, the landlord may only escape liability under subsection (d) if they prove that, before they took possession of the property, they received a writ of possession from a circuit court or

11

that they complied with the requirements of subparagraph (b)(2)(ii). This qualifying safe harbor language therefore lays out an affirmative defense—if the landlord in the above hypothetical did not receive a writ of possession, the judge would consider or the jury would be charged with determining whether the landlord (1) reasonably believed the protected resident had abandoned or surrendered the property based on a reasonable inquiry into the status of the property; (2) provided the notice required in subsection (c), and; (3) received no responsive communication to that notice within 15 days.

The "reasonable inquiry" required to use nonjudicial self-help does not, on its own, entitle the tenant to bring suit under subsection (d) where no eviction or other actions that deprive actual possession occurred. This plain language reading of the statute comports with the General Assembly's purpose in adding the safe harbor provision to the statute, which was not to carve out the elements of a separate claim under subsection (d), but to provide clear standards as to when nonjudicial self-help is available. Attempting to match the remedies in subsection (d) with any potential damages caused by a party's failure to conduct a "reasonable inquiry" further demonstrates that the General Assembly did not intend to create the cause of action now recognized by the Court. Any actual damages potentially caused by a party's failure to conduct a "reasonable inquiry" are negligible to non-existent. If the General Assembly intended to create a cause of action for failing to conduct a "reasonable inquiry," it would have included remedies that match the alleged misconduct; such as monetary fines or suspension of the offender's license.

In reviewing the legislative history presented *infra*, and the record of this case, two things are certain. First, as a policy matter, the clear intent of the General Assembly in

12

enacting RP § 7-113 was to protect citizens from threats of eviction, nonjudicial evictions, or other actions that deprive actual possession. *See* Dep't Legis. Servs., *Fiscal and Policy Note (Revised)*, *House Bill 1308*, at 1 (2013 Session); Dep't Legis. Servs., *Fiscal and Policy Note (Revised)*, *Senate Bill 642*, at 1 (2013 Session). Second, at no point were the Petitioners evicted or threatened with eviction.

This legislative intent is crystal clear beginning with the title: "Residential Property – Prohibition on Nonjudicial Evictions." Although struck from the final bill, the preamble stated the underlying intent as resolving the problem of "[s]o-called self-help evictions in the residential context [that] are inconsistent with human dignity and human rights and will lead to an increased potential for violent confrontations and sudden homelessness." *See infra* page 18–19 (discussing the preamble in the first reader of House Bill 1308). The amendments to add a notice provision created a safe harbor method for a person claiming right to possession to identify whether a property was, in fact, abandoned.

The statutory form notice and the plain language of subsection (c)(1) confirms our reading that subparagraph (b)(2)(ii) sets out a safe harbor provision rather than the elements of a cause of action. If a party claiming the right to possession seeks to use self-help eviction on an abandoned property—and follows the requirements of RP § 7-113(b)(2)(ii)—then, under subsection (c), they are required to (1) mail "all occupants" of the property written notice of potential eviction; and (2) post written notice of potential eviction on the front door of the property. RP § 7-113(c)(1). If the property is occupied, the party or parties in possession are instructed to call the phone number provided on the

13

notice.  As described above, the notice provision set out in subsection (c), is part of a safe

harbor confirmation process to determine whether a property is occupied or abandoned.

Based on the preceding analysis, RP § 7-113 operated exactly as House Bill 1308

was intended by the General Assembly because notice was provided to Petitioners and their

response to that notice prevented them from being evicted.  The Respondents' use of the

statutory form notice averted every concern presented by the Rental Housing Coalition's

testimony at the bill hearing—"sudden lockouts, homelessness, and a greater potential for

violent confrontations between residents and those attempting a Wild West eviction."  *See*

*infra* page 24 (discussing the Rental Housing Coalition's testimony at the bill hearing).

For these reasons, the remedies in subsection (d) do not apply to the exceptions in

subsection (b)(2).  If the remedies do not apply for the failure to make a "reasonable

inquiry," then the Circuit Court for Baltimore City was correct when it found that the

Petitioners failed to a state claim under the statute upon which relief could be granted.  *See*

Maryland Rule 2-322(b)(2) ("The following defenses may be made by motion to dismiss

filed before the answer, if an answer is required: . . . (2) failure to state a claim upon which

relief can be granted[.]"); *Barclay v. Castruccio*, 469 Md. 368, 374 (2020) ("The granting

of a motion to dismiss is proper only if the allegations and permissible inferences, if true,

would not afford relief to the plaintiff, i.e., the allegations do not state a cause of action."

(citation and internal quotation marks omitted)).

Thus, I would hold that the Respondents' failure to conduct a "reasonable

inquiry"—whether or not it occurred under the facts pled in the amended complaint—

before posting a notice of eviction does not provide Petitioners a cause of action under RP

§ 7-113. As a result of this statutory interpretation, the circuit court did not err in granting Respondents' motion to dismiss for failure to state a claim upon which relief can be granted. Moreover, the Court of Special Appeals correctly decided this case when they affirmed the circuit court's dismissal of Petitioners' amended complaint.

Such a reading of the plain language is confirmed by the legislative history, hence it is important to understand the underlying issues that drove the General Assembly's outrage over this Court's decision in *Nickens*. The underpinnings of this legislative response to prevent nonjudicial self-help evictions as enacted in RP § 7-113 are found resoundingly in the legislative hearings that controlled the evolution of the statutory language of the third reader House Bill 1308.

**B.** **The General Assembly Abrogates Maryland's Long-Standing Common Law Self-Help Rule Described in Nickens to Prohibit Nonjudicial Evictions.**

*1.* *The* Nickens *Decision.*

As this Court aptly explains in *Nickens*, the common law remedy of peaceable self-help traces its roots back to the English common law statutes of 5 Richard II, Chapter 8 (1381) and 8 Henry VI, Chapter 9 (1429), which respectively created causes of action for forcible entry and forcible detainer. *Nickens*, 429 Md. at 64–66. Before the late fourteenth century, a titleholder to property in England was within their rights to enter property and "'regain . . . possession by force' from an unlawful possessor." *Id.* at 66 (quoting *Moxley v. Acker*, 294 Md. 47, 50 (1982)).

Then, in 1381, 5 Rich. II, ch. 8 "limited the amount of 'force' that a titleholder may use to repossess his [or her] property by establishing that a right of entry may be made with

15

'not a strong hand, nor with a multitude of people, but only in a peaceable and easy manner[.]'" *Id.* 5 Rich. II, ch. 8 also prescribed a criminal penalty for conduct in violation of the statute. *Id.* In a similar vein, although inapplicable to leasehold tenants, 8 Hen. VI, ch. 9 created a civil cause of action for owners of a freehold estate in land to "regain possession of property wrongfully detained[.]" *Id.* at 67 (quoting *Eubanks v. First Mount Vernon Indus. Loan Ass'n, Inc.*, 125 Md. App. 642, 662–63 (1999)). The English common law was imported to the Maryland colony, adopted in Maryland's first Constitution of 1776, and remains in effect through Article 5 of the Declaration of Rights in the current Constitution, which was adopted in 1867. *See id.* at 65 n.11 ("These statutes were derived from the English common law when our Declaration of Rights was adopted on 3 November 1776 as Article 3. . . . This provision was reconstituted as Article 5 of the Maryland Declaration of Rights in 1867."); Md. Const., Decl. of Rights, art. 5.

When *Nickens* was decided in 2012, peaceable self-help had been a "long-established common law remedy for titleholders in Maryland." *Nickens*, 429 Md. at 68; *see Manning v. Brown*, 47 Md. 506 (1878). *Nickens* stemmed from a foreclosure dispute between Mount Vernon Realty Group ("MVRG") and Demetrius Nickens. The *Nickens* Court was accordingly tasked with determining whether statutorily enumerated eviction procedures in the Baltimore City Code precluded MVRG's use of peaceable self-help when it threatened to remove Mr. Nickens from the property, and then subsequently conducted a "lock-out." *Nickens*, 429 Md. at 58.

Mr. Nickens lived with his parents in their Baltimore City home until his parents moved out. *Id.* at 58–59. Mr. Nickens' parents allowed him to remain in the home after

16

they moved out as long as he paid rent to cover the monthly mortgage payment. *Id.* However, after the parents' monthly amount due increased and Mr. Nickens ceased making payments, the account fell in arrears and the parents' mortgage servicer initiated foreclosure proceedings. *Id.* at 59. The mortgage servicer received a foreclosure judgment in the Circuit Court for Baltimore City and, through its law firm, retained MVRG to remove Mr. Nickens from the property. *Id.* MVRG's process in removing Mr. Nickens from the property was two-fold. *Id.* at 59–60. First, MVRG sent a notice to Mr. Nickens threatening to imminently enter his home, remove Mr. Nickens' belongings, and take possession of the property. *Id.* Then, upon learning that Mr. Nickens was out of town, MVRG entered the property, disposed of Mr. Nickens' personal belongings, changed the locks, and placed a "no trespassing" sign on the front door. *Id.*

Even though the Nickens' mortgage servicer pursued a court proceeding and received a judgment in circuit court, this Court's upholding of the common law remedy of peaceable self-help was viewed by the housing and tenants' rights communities as having broad implications regarding the actions available for mortgage providers, landlords, and others to regain possession of real property. In finding that the common law remedy of peaceable self-help was not abrogated by the General Assembly nor superseded by Balt. City Code art. 13, § 8B-2, the Court allowed parties seeking the right to possession to sidestep the statutory eviction process for repossessing property through court proceedings in Baltimore City. *See id.* at 75 ("Based on the express language of the ordinance, we conclude that the Mayor and City Council of Baltimore did not intend to supersede

17

pervasively and comprehensively the use of the common law remedy of self-help in Baltimore.").

*Nickens* was correctly decided because there had been no action by the General Assembly since 1776 to revise, amend, or repeal the English common law that allowed the use of peaceable self-help as a remedy to regain possession from an unlawful possessor. Absent action by the General Assembly, the English common law prevailed under Article 5 of the Declaration of Rights. However, the use of a nonjudicial self-help eviction in *Nickens* sparked outrage in the General Assembly and drove the legislative effort to enact the statutory protections enumerated in RP § 7-113.

> 2. *First Reader – House Bill 1308 – Residential Real Property – Prohibition on Nonjudicial Evictions.*

While preambles[4] are relatively rare in legislation passed by the General Assembly, the first reader of House Bill 1308 included a preamble to express the intensity of emotions held by the legislators against this Court's holding in *Nickens*. Ultimately, this language as a preamble was deleted from the final bill, but the words of the preamble are instructive as to the legislature's intent in enacting this legislation:

---

[4] In *Washington Gas Light Co. v. Maryland Public Service Comm'n*, this Court looked to the Maryland Department of Legislative Services' *Legislative Drafting Manual* in discussing the use of preambles in legislation. 460 Md. 667, 683–84 (2018) (citing Dep't Leg. Servs., *Legislative Drafting Manual 2013*, at 152–53 (2012), *available at* http://dlslibrary.state.md.us/publications/OPA/A/LDM_2013.pdf [https://perma.cc/5AWJ-ZS4M]). We explained that "[a]though infrequently used, a preamble is sometimes desirable in legislation to state legislative intent or facts showing the background and necessity for a bill." *Id.* at 684 (alteration in original) (citation omitted).

18

WHEREAS, The General Assembly has created numerous expedited court processes to assist owners of residential real property in quickly recovering possession of their properties with the assistance of the sheriff; and

WHEREAS, So-called self-help evictions in the residential context are inconsistent with human dignity and human rights and will lead to an increased potential for violent confrontations and sudden homelessness; and

WHEREAS, The General Assembly intends to supersede the ruling of the Court of Appeals of Maryland in *Nickens v. Mount Vernon Realty Group, et. al.*, 429 Md. 53 (2012), and abrogate any right to so-called self-help eviction that owners may possess in the context of residential foreclosures, tax sale foreclosures, landlord-tenant actions, and mobile home park actions, now, therefore, [Section 1 and the text of the bill follows.]

Under this rubric of legislative intent, House Bill 1308 proposed language to prohibit nonjudicial evictions in three sections of the Real Property Article: (1) § 7-112 (later codified as § 7-113[5]) relating to foreclosure sale and tax sale purchasers; (2) § 8-216 relating to landlord and tenant matters; and (3) § 8A-1102 relating to mobile home park owners. We will focus on the legislative process and amendments for the language of RP § 7-113 which is at issue in this case.

After defining a "protected resident" and a "residential property," the bill language in the first reader of House Bill 1308 outlined the prohibited acts as follows:

(B)(1) Except as provided in paragraph (2) of this subsection, a secured party, foreclosure sale purchaser, plaintiff in a tax sale foreclosure under Title 14 of the Tax – Property Article, or a successor to a secured party,

---

[5] During the 2013 session, two different bills proposed adding a new section after RP § 7-111 and thus both proposed in the language of each bill that their new section would be RP § 7-112. In codifying the two bills, Senate Bill 199 was signed first as chapter 205 and became RP § 7-112. Senate Bill 199 addressed the refinancing of unpaid debts without the permission of junior lienholders which is not relevant to this case. 2013 Md. Laws, ch. 205. Because House Bill 1308 was the second bill to be signed into law, as chapter 515, it became RP § 7-113. We refer to it as RP § 7-113 in this section on legislative history even though it is identified in the bill as RP § 7-112.

foreclosure sale purchaser, or a plaintiff in a tax sale foreclosure may not take possession or threaten to take possession of residential property from a protected resident by locking the resident out or any other action, including willful diminution of services to the protected resident by interrupting or causing the interruption of heat, running water, hot water, electricity, gas or other essential services.

The language of subsection (b) is straightforward in that it sets up certain prohibited acts and exceptions to those prohibited acts. Subsection (b)(1) enumerates the prohibited acts of forced foreclosure lockouts, threats of forced foreclosure lockouts, and diminutions of services. However, it begins with the phrase "[e]xcept as provided in paragraph (2) of this subsection[.]" Subsection (b)(2) thus identifies certain exceptions to the prohibited acts as follows:

> [(B)] (2) A secured party, foreclosure sale purchaser, plaintiff in a tax sale foreclosure under Title 14 of the Tax – Property Article, or a successor to a secured party, foreclosure sale purchaser, or a plaintiff in a tax sale foreclosure may take possession of residential real property from a protected resident only:
> (I) In accordance with a writ of possession issued by a court and executed by a sheriff or constable; or
> (II) If the protected resident has abandoned or surrendered possession of the property.

Here, as articulated clearly by the General Assembly in this language, are two key exceptions to the prohibited acts of subsection (b)(1). The first is the obvious exception when the proceeding is not nonjudicial. Thus, if there is a legal proceeding in which a court has issued a writ of possession and the writ is executed by a sheriff or constable, then the prohibited acts do not apply.

The second exception is significant to our analysis. The original first reader bill includes an exception for situations where the "protected resident has abandoned or

20

surrendered possession of the property." In other words, nonjudicial self-help is still available if there is evidence of abandonment or the surrender of the property by the protected resident.

The first reader bill provides remedies in the original subsection (c) (after the committee amendments, the remedies become subsection (d) as fully described *supra*). The application of the remedies is broadly worded to apply to violations of subsection (b). The remedies as originally outlined in the bill are:

> (C)(1) If in any proceeding the court finds that a secured party, foreclosure sale purchaser, plaintiff in a tax sale foreclosure under Title 14 of the Tax – Property Article, or a successor to a secured party, foreclosure sale purchaser, or a plaintiff in a tax sale [foreclosure] violated subsection (B) of this section, the protected resident may recover:
> (I) Possession of the property;
> (II) Three times actual damages; and
> (III) Reasonable attorney's fees and costs.
> (2) (I) The remedies set forth in this subsection are not exclusive.
> (II) A [protected] resident or any person claiming under a protected resident may recover any other actual or consequential damages available under any other applicable law.

The question then arises as to whether the remedies apply to the exceptions in subsection (b)(2). At this point, it is important to note that while these remedies are stated to apply to the entirety of subsection (b), abandonment is a provision of subsection (b)(2) that is a statutory exception to the prohibited acts. It is therefore logical to interpret by its plain language that the remedies articulated in subsection (c) apply to the prohibited acts in subsection (b)(1) but would not apply to the articulated exceptions in (b)(2).

With this background in mind, I now turn to the legislative process that occurred after the introduction of the first reader of House Bill 1308.

*3.    The Legislative Committee Hearing on House Bill 1308.*

The stage was set for a classic confrontation between the advocates of housing and tenants' rights organizations and the representatives of the property owners. In the aftermath of this Court's *Nickens* decision, the advocates of housing and tenants' rights organizations urged the General Assembly to take action to repeal Maryland's long-standing common law practice of nonjudicial self-help residential evictions. As a perennial opponent in the legislative give-and-take, the property owners were expected to vigorously oppose the proposed new restrictions on eviction laws.

The bill hearing was held on March 7, 2013, in the Environmental Matters Committee.[6] The testimony of the proponents of House Bill 1308 was organized by the Public Justice Center as a participant in the Maryland Rental Housing Coalition. The proponents offered three panels of testimony that included witnesses with personal testimony of being forced out of their homes. The proponents' testimony took up most of the time during the approximately one-hour hearing.

In addition to the Public Justice Center, the bill file contains written testimony from housing advocates representing a broad spectrum of organizations dealing with rental housing, legal assistance, and poverty. These organizations included the Legal Aid Bureau, Inc., Maryland Alliance for the Poor, Baltimore Neighborhoods, Inc., Casa de Maryland,

---

[6] Recording of March 7, 2013, Environmental Matters Committee hearing available at: https://mgahouse.maryland.gov/mga/play/f3e53cfaf06b4a2b9cc819be9e08ccf1/?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c&playfrom=123476    [https://perma.cc/VJ9W-YLQJ].

22

SHARP (Coalition to Stop Homelessness and Reduce Poverty), Maryland Volunteer Lawyers Service, and Maryland Disability Law Center.

On the other side, a coalition named Property Owners Association of Maryland, Inc., a nonprofit trade association comprised of five separate property owners associations from across Maryland, was the primary voice at the hearing. Additional written testimony was provided by the Maryland Bankers Association, Maryland Association of Realtors, and the Apartment and Office Building Association of Metropolitan Washington.

The pièce de résistance of the written testimony was a letter from Congressman Elijah E. Cummings, a former Speaker *pro tem* of the House of Delegates. *See* Bill File to H.B. 1308, Testimony – Written Statement of the Honorable Elijah E. Cummings in Support of S.B. 642/H.B. 1308 (2013). In the letter, Congressman Cummings offered testimony of his personal experience during the 1970s when he was evicted by a landlord for a late rent payment. He explained that, at that time, he relied on his student financial aid for personal expenses including his rent when he was a student in law school. *Id.* One day, having missed that month's rent, and even though he had previously informed his landlord that his financial aid check would be a few days late, he states: "I arrived home from class to find all my possessions on the street in front of my apartment building. Strangers were going through my belongings, and the portable typewriter I needed for my courses was missing." *Id.*

Congressman Cummings' personal recollection of the self-help eviction mirrored the written accounts of testimony by other witnesses when he wrote: "Today, more than four decades later, I can still remember the pain, anger and desolation that I felt.

23

Fortunately, I am a peace-loving person, but, as a lawyer, I can tell you that this is not always the case with everyone who suffers this kind of mistreatment." *Id.*

Written testimony from the Rental Housing Coalition offered the personal experiences of twelve individuals subject to nonjudicial "lockouts." *See* Bill File to H.B. 1308, Testimony – Written Statement of the Rental Housing Coalition in Support of H.B. 1308 (2013). Recognizing that most well-established landlords and foreclosure purchasers do not engage in this type of eviction, the testimony noted that most advocates, prior to this Court's *Nickens* decision, thought that nonjudicial evictions were illegal. *Id.*

Significantly, the Rental Housing Coalition's written testimony almost universally detailed immediate lockouts with little to no prior notice. In addition, three individuals who provided personal written testimony also testified as a part of a panel during the house committee hearing. For example, W.L., a resident of Prince George's County who had fallen behind on paying rent, received a text from his landlord that the locks to his home had been changed and his possessions placed under tarp outside the home. *Id.* When L.G., a resident of Baltimore County withheld rent payments until her landlord made repairs, the landlord provided no notice before he entered her home and changed the locks. *Id.* S.B., a resident of Baltimore County, described being told to vacate her home with no notice despite always paying her rent on time. *Id.* When S.B. tried to reason with her landlord, the landlord's wife told S.B. that she had ten days to vacate the property. *Id.* With no notice, and before the ten day period had expired, S.B.'s landlord entered the home and changed the locks. *Id.*

24

In light of this testimony, and citing to the *Nickens* opinion, the Rental Housing Coalition concluded that "[t]he Court's decision to upend settled practices in Maryland will undoubtedly lead to increased **sudden lockouts, homelessness, and a greater potential for violent confrontations between residents and those attempting a Wild West eviction**." *Id.* (emphasis in original).

In spite of the inimical relationship between the two groups, the expected opposition of the property owners failed to materialize. As a unified group, at the hearing and in their written testimony, they proffered support for the bill if clarifying amendments were adopted to address certain areas of concern. In addition, the property owners promised to work with the bill's proponents to craft consensus amendments that both sides could agree on.

The key area of concern for the property owners was to clarify the abandonment exception so that there were clear standards for when a foreclosure sale purchaser or landlord could act. The current abandonment language was too open-ended and potentially subject to court challenges over whether a property was abandoned or not. The property owners proposed a safe harbor notice provision that would assure protections for both sides, as explained succinctly in the testimony of the Maryland Bankers Association:

> The proponents also acknowledge that the abandonment or surrender of property by the tenant or owner are legal reasons for the landlord/foreclosure purchaser to take possession of the property. The [Maryland Bankers Association] supports amendments that make it clear when the use of nonjudicial self-help is permissible. They are: when the party with a right to possess 1) believes the protected resident has abandoned or surrendered possession of the property; 2) provides notice by posting on the front door of the residential property and mails by first-class mail addressed to "all occupants" at the address of the residential property a

written notice in a specified statutory form; and 3) receives no written response to that notice within 10 days after the later of posting or mailing notice as required by the statute.

*See* Bill File to H.B. 1308, Testimony – Written Statement of the Maryland Bankers Association in Support of H.B. 1308 (2013).[7]

The property owners also expressed concerns over two additional sections of the bill. First, they urged the legislative committee to adopt better definitions for the terms in the statute, including "party with a right to possess," "residential property," "threaten to take possession," "willful diminution of services," and "protected resident" (clarifying that a "protected resident" does not include a trespasser or squatter). Second, the property owners uniformly opposed the application of "treble" damages in the original remedies and proposed that the remedy language be amended to "actual" damages.

Although a far cry from the anticipated opposition to the bill, the Maryland Association of Realtors addressed concerns in their written testimony regarding the statutory definition for "threaten to take possession," as well as the inclusion of "or any other action" in the language of the first reader. Bill File to H.B. 1308, Testimony – Written Statement of the Maryland Association of Realtors in Opposition to H.B. 1308

---

[7] The Maryland Bankers Association's proposal at the bill hearing mirrors emergency legislation passed during the 2009 legislative session requiring "notices of foreclosure to be sent to all occupants of a residential property (1) when a foreclosure is filed; (2) no earlier than 30 days and no later than 10 days prior to the foreclosure sale; and (3) a final notice after the entry of a judgment awarding possession of the property and before any attempt to execute the writ of possession." Dep't Legis. Servs., *Fiscal and Policy Note (Revised)*, *House Bill 776*, at 1 (2009 Session); *see* 2009 Md. Laws, ch. 615. Chapter 615, which was added as RP § 7-105.9 and is currently RP § 7-105.11, was signed into law in response to the fallout from the housing bubble collapse in 2007-08. *See* Ronald Deutsch & Jeffrey Nadel, *Gordon on Maryland Foreclosures* 5, 638 (5th ed. 2021).

(2013). Specifically, the Association alluded to the possibility that the use of a legal process—the statutory form notice—could violate the statute. *Id.* In opposing this illogical outcome, the Association's written testimony noted that it was "concerned that [the statutory form notice] could be considered a threat even when the landlord is planning to take possession through the normal judicial process." *Id.* Moreover, the phrase "or any other action" in the first reader prompted concerns about whether that language "would prevent a landlord from informing a tenant that the landlord can file for eviction if the tenant does not pay . . . rent." *Id.* As a result of these concerns, the Association emphasized the importance of "clarify[ing] the abandoned property exception." *Id.*

Sensing a kumbaya moment[8] in the legislative process, the committee concluded the hearing with a commitment from both sides to work on amendments for clarification of the bill language suitable for a consensus package to be considered at a voting session.

*4.  The Committee Amendments to House Bill 1308.*

---

[8] In legislative slang, a kumbaya moment occurs when two stridently opposed sides to a proposed bill forge a compromise that resolves the conflict and allows the legislators supporting either side to join together in voting in favor of the bill. Based on the song Kumbaya, the legislative compromise is symbolic of the typical performance of the song where the singers join hands and sing the lyrics about peace and harmony. Kumbaya has been recognized by the Georgia legislature as the "state historical song" by legislation passed in 2017. Georgia General Assembly, S.R. 293, https://www.legis.ga.gov/legislation/50935 [https://perma.cc/WKW8-5VYA]. ("Recognizing Georgia's first state historical song, known worldwide as 'Kumbaya[.]'"); *see also* Christopher Ingraham, Orrin Hatch Has Drug Puns, Washington Post (September 13, 2017), https://www.washingtonpost.com/news/wonk/wp/2017/09/13/orrin-hatch-has-drug-puns/ [https://perma.cc/GSE6-DD46] (describing a press release from Senator Orrin Hatch in which he had high hopes that the bipartisan Marijuana Effective Drug Study (MEDS) Act of 2017 would "be a kumbaya moment for both parties").

A package of committee amendments was considered at the voting session of the Environmental Matters Committee on March 19, 2013. The amendments addressed most of the topics discussed at the committee hearing. An identical set of committee amendments was offered in the Senate and the process of forging this compromise and the explanation of the changes to the statutory language are best explained in an email from C. Matthew Hill, Staff Attorney of the Public Justice Center, to Senator Anthony Muse, sponsor of Senate Bill 642:

> I have attached a redline from [staff of the Judicial Proceedings Committee] of the compromise amendments on SB 642 that Sen. Muse has agreed to offer tomorrow in the voting session of JPR. . . .
>
> Here again are the talking points for the compromise.
>
> After extensive negotiations between the housing advocates and associations representing bankers and landlords, we have agreed upon a set of compromise amendments.
>
> The following organizations do **not** oppose SB 642/HB 1308 with these sponsor amendments: Md. Bankers Association, Md. Multi-Housing Association (MMHA), Apartment and Office Buildings Association (AOBA), Maryland Association of Realtors, and Maryland Property Owners Association.
>
> These compromise amendments:
>
> - Clarify the definitions of terms like "threaten to take possession" "abandonment" and "willful diminution of services" to protect residents and provide clarity to bankers and landlords.
> - Provide a method for mortgagees and foreclosure sale purchasers to identify and secure abandoned properties.
> - Limit damages to actual damages and reasonable attorney's fees and costs. This removes the provision for treble damages that housing advocates had requested.
> - Clarify that landlords may take temporary measures to secure an unsecured property without violating this proposed legislation.

28

The Maryland Rental Housing Coalition including the Public Justice Center, Baltimore Neighborhoods Inc., Maryland Legal Aid Bureau, Homeless Persons Representation Project, Maryland Disability Law Center, CASA de Maryland, Civil Justice Inc., St. Ambrose Housing Aid Ctr., Md. Volunteer Lawyers Service, Univ. of Baltimore School of Law Civil Advocacy Clinic, Washington Comm. For Civil Rights and Urban Affairs, Go Northwest Housing Ctr., and Baltimore County Communities for the Homeless support these compromise amendments.

*See* Bill File to S.B. 642, Email from C. Matthew Hill to Senator Anthony Muse (2013) (bullet points and emphasis in original).

The email from the Public Justice Center explains the policy underpinning the committee amendments to House Bill 1308. These amendments affect the language and structure of the bill. The amendments can be briefly summarized in three parts. First, the prohibited acts were clarified because the definitions were significantly revised. The phrase "threaten to take possession" was not defined in the first reader and new language was added to clarify the types of actions that would subject a party to liability under the statute. Significantly, the new definition added in the amended language focused on the imminence of the threat, requiring that the threat to take possession be "words or actions intended to convince a reasonable person that a party . . . intends to take imminent possession of residential property[.]" Another significant addition to the bill clarified the phrase "or any other action" by creating a separate subparagraph, (b)(1)(iii), that prohibits: "Taking any other action that deprives the protected resident of actual possession."

Second, clarifying language was added to the abandonment provisions to include the safe harbor notice provision (now subsection (c)). The committee amendments provided a statutory form notice to be used by a party that avails themselves of the

29

exception in subparagraph (b)(2)(ii). The language also provides for the posting and mailing of the notice with a 15-day period for the protected resident to respond (instead of the 10-day period proposed by the property owners in their testimony).

Significant to our analysis is the "reasonable inquiry" qualifying language added by amendment to the original language in the first reader. Added to the abandonment exception in subparagraph (b)(2)(ii) is the language that a party claiming the right to possession may use nonjudicial self-help to take possession if the party "[r]easonably believes the protected resident has abandoned or surrendered possession of the property based on a reasonable inquiry into the occupancy status of the property[.]" These clarifications were deemed critical so that the abandonment exception could be more easily recognized by both parties and clearly interpreted by the courts when someone challenged a nonjudicial eviction or other actions that deprive actual possession based on the property being abandoned.

Third, the remedies were moved to subsection (d) but were not changed except that the treble damages initially proposed were downgraded to actual damages. As amended, the remedies continued to be entirely oriented to prohibit acts outlined in subsection (b)(1), which relates specifically to evictions, threats of eviction, the diminution of services, or other actions that deprive actual possession. Important to our analysis, no amendment was adopted to apply a remedy under the exceptions in subsection (b)(2) if a "reasonable inquiry" is not undertaken.

Additionally, to underscore the statement of legislative intent, the third "Whereas" clause of the first reader preamble was restated in the committee amendments as "Section

30

2" of the bill. *See supra* page 19. By doing so, the third reader bill clearly articulates the General Assembly's intent to abrogate the English common law right to nonjudicial self-help evictions and to supersede this Court's holding in *Nickens*.

> 5. *The Unanimous Vote on a Favorable Motion for House Bill 1308 in Both Chambers.*

In a true kumbaya moment of legislative process, the amended House Bill 1308 passed unanimously 24-0 on a favorable motion in the House Environmental Matters Committee on March 19, 2013. The third reader vote in the House of Delegates on March 21 was also a unanimous vote of 136-0. House Bill 1308 crossed over to the Senate and the committee vote in the Judicial Proceedings Committee was a unanimous 9-0 on March 28. Finally, the bill passed third reader in the Senate by a unanimous 47-0 vote on April 3.[9] House Bill 1308 was signed by Governor Martin O'Malley on May 16.

And so, in light of this legislative history, it is apparent that the General Assembly intended for the remedies in the statute to only apply when the party in possession is threatened with imminent eviction or actually dispossessed of the property. The Majority's approach to the statute runs contrary to the circuit court's common-sense understanding and instead provides remedies that do not match up with the Petitioners' newfound claim for the failure to conduct a "reasonable inquiry." For that reason, it is instructive to shed light on proceedings before the Circuit Court for Baltimore City, before turning to the

---

[9] For the Senate vote, House Bill 1308 was placed on a consent calendar consisting of 32 different House bills. A consent calendar is a calendar of non-controversial measures that has one vote passing all measures. In this case, most of the bills were House bills for which there were cross-filed Senate bills that had already passed third reader in the Senate.

31

question of whether the statutory form notice transforms into a threat to take imminent possession absent the required "reasonable inquiry."

## C. Proceedings in the Circuit Court for Baltimore City—Is There a Nexus Between the Requirement that a Party Conduct a "Reasonable Inquiry" and the Remedies Set Forth in RP § 7-113(d)?

The motions filed under the amended complaint in this case were argued before the Circuit Court for Baltimore City at two separate hearings held on July 19 and August 28, 2017. First, the circuit court judge considered a motion by the Wheelings' counsel[10] for partial summary judgment based upon *Blackstone v. Sharma*, a then-recent decision by the Court of Special Appeals holding that the finance company in a mortgage foreclosure was required to be licensed as a collection agency. *See* 233 Md. App. 58 (2017).[11]

The two motions relevant to this appeal are the motions to dismiss filed by Selene and by Century 21. In considering the motions, the circuit court judge first asked for clarity on the legal posture of the two separate cases.

### 1. The Rodriguez Claim.

---

[10] Counsel for Ms. Rodriguez also represented Mr. and Ms. Wheeling in the circuit court proceedings below. Because the Wheeling and Rodriguez claims are factually distinct, and to avoid confusion, I sometimes refer to Petitioners' counsel as the "Wheelings' counsel."

[11] This Court reversed the Court of Special Appeals' holding in *Blackstone* in an August 2, 2018, opinion. *See Blackstone*, 461 Md. at 87. During the July 19, 2017, motions hearing, Petitioners' counsel referenced the Court of Special Appeals' holding in *Blackstone* and argued that, based on that decision, they were entitled to partial summary judgement. In arguing so, Petitioners attempted to establish that Respondents acted on behalf of unlicensed foreign statutory trusts. Moreover, Petitioners argued that the Court of Special Appeals' decision in *Blackstone* stood for the proposition that Respondents, acting on behalf of unlicensed foreign statutory trusts, could not lawfully evict or threaten to evict a Maryland resident. This Court's holding in *Blackstone* (and the Court of Special Appeals' holding shortly before the motions hearing) is inapplicable to the facts here.

Counsel for Century 21 outlined the fully litigated foreclosure proceeding of the Rodriguez property at 2418 Edmondson Road in Baltimore City. Counsel highlighted the facts leading to ratification by the court of the foreclosure action and the posting of the writ of possession by the Sheriff of Baltimore City. The docket entries on this case provide the following pertinent dates:

January 7, 2015 - Order to docket foreclosure entered in Circuit Court for Baltimore City.

June 22, 2016 - Trustees' Report of Sale entered and confirmed that the property was purchased by Christiana Trust for $42,000.

July 11, 2016 - Certificate of Publication entered.

September 15, 2016 - Final Order Ratifying Report of Sale.

January 30, 2017 - Judgment awarding possession.

February 8, 2017 - Writ of Possession issued by Court to the Sheriff of Baltimore City with notice to vacate the premises on or before March 28.

Counsel for Century 21 explained to the circuit court judge that the Sheriff of Baltimore City ("Sheriff") posted the property on or about February 10 advising the resident to vacate the premises by March 28 or else to be subject to an eviction on that date. On February 22, Petitioners allege that Gina Gargeu, a real estate salesperson for Century 21, posted a statutory form notice under RP § 7-113.[12] A friend of Ms. Rodriguez contacted

---

[12] Ms. Gargeu's involvement in the Rodriguez claim, for the purposes of this appeal, is limited to her alleged violation of RP § 7-113. Petitioners concede that the circuit court correctly dismissed their claim for damages against Ms. Gargeu under the Maryland Consumer Protection Act, Md. Code (1975, 2013 Repl. Vol.), Com. Law ("CL") § 13-104, because she is exempt from that statute as a real estate salesperson.

33

Century 21 on February 27 to notify the company under the terms of the notice that the property was occupied.

Pursuant to the statutory language of RP § 7-113, and as a result of the contact by the friend of Ms. Rodriguez, Century 21 did not pursue a nonjudicial eviction under the abandonment exception.

2.      *The Wheeling Claim.*

Unlike the Rodriguez case, where a fully-litigated foreclosure action had transpired in the circuit court, the facts plead in the Wheeling claim relating to RP § 7-113 are evanescent.[13]  The best that can be inferred from the facts plead in the amended complaint is that Selene engaged in an unfair and deceptive trade practice because they posted the statutory form notice from subsection (c) of RP § 7-113 on the door of the house where the Wheelings resided.  Whitney and Eric Wheeling were tenants of a property located at 167 Cardamon Drive in Edgewater, Maryland.  The property was owned by Donna Poole during that time.  Although the real property is located in Anne Arundel County, there is no evidence in the record of an underlying court proceeding in that jurisdiction.

During the July 19, 2017, motions hearing, the circuit court judge attempted to clarify why the Wheelings—whose rental property was in Anne Arundel County—were before the Circuit Court for Baltimore City.  Selene's counsel explained that the Wheelings "had no relationship whatsoever with Selene or with any particular lender, nobody."

---

[13] The facts plead in the amended complaint regarding the Wheeling claim primarily revolve around whether Selene was operating as an unlicensed collection agency in violation of the Court of Special Appeals' then-recent decision in *Blackstone v. Sharma*, as explained in footnote 11, *supra*.

34

E. 173. The facts presented in the Wheelings' amended complaint support this assertion. The amended complaint states that "upon information and belief" the loan that Ms. Poole used to purchase 167 Cardamon was in default. E. 42. However, the amended complaint goes on to state that "[n]o foreclosure or land-lord [sic] tenant proceeding had been initiated in any court related to the Wheeling Property." E. 45. Selene's counsel further characterized the relationship between Selene and the Wheelings as nonexistent during the August 27, 2018, motions hearing. E. 206.

To clarify the facts in the amended complaint, the circuit court judge asked about the posture of the Wheeling claim. The Wheelings' counsel reiterated the facts presented in the amended complaint, specifically that the property was posted with the statutory form notice, but it remained unclear what connection the Wheelings had to the Respondents. During the August 28, 2017, motions hearing the Wheelings' counsel clarified that "[i]n Mr. and Mrs. Wheeling's case, according to the well-pled facts, Your Honor, and the public records, no foreclosure was filed." E. 213. From the amended complaint and the motions hearings it is evident that the Wheelings' only connection to this case is that they were Donna Poole's tenants at 167 Cardamon Drive.

Despite this unclear posture, and the Wheelings' tenuous connection to the Respondents in this case, it is crystal clear from the record that they were never evicted or subject to other actions that deprived them of actual possession of 167 Cardamon Drive.

3.     *Is the Posting of the Statutory Form Notice a Threat of Imminent Eviction?*

After clarifying to the extent possible the posture of both cases through the arguments presented by each attorney, the circuit court judge probed for the proper

35

interpretation of the statutory language of RP § 7-113. The first question was whether the posting of the notice could, under certain circumstances, be an imminent threat under the definitions in the statute. The second question was what relief was available under the remedies of the statute for the posting of the notice in these two cases.

The crux of the argument made by the Wheelings' counsel was that the posting of the statutory notice itself was a threat of dispossession. Due to the "reasonable inquiry" language in the exceptions section of the statute, counsel argued that posting the notice transforms into an imminent threat of eviction. In other words, in analyzing both the Rodriguez and Wheeling claims, the mere posting of a form notice provided in the statute violates the statute, which resulted in the following colloquy between the Wheelings' counsel and the circuit court judge:

| | |
|---|---|
| Wheelings' Counsel: | So as I generally described earlier, this statute was created as remedial legislation in response to the Court of Appeals decision in *Nickens*. My colleague's essential argument is we didn't actually carry out the eviction, so therefore [we are] not liable. That's one point. What my colleague overlooks is[,] is that the statute governs threats of eviction. And there is no dispute that there was a threat of eviction with that notice. . . . |
| The Court: | So I read the notice that's attached here. So keep moving. |
| Wheelings' Counsel: | So the reason—it's not just the notice, it's the circumstances surrounding the notice, Your Honor. The circumstances— |
| The Court: | But the threat, under your assertion, is contained in that notice. |

36

Wheelings' Counsel:        Correct.

E. 187–88.

The counterpoint to the Wheelings' argument that the notice, by and of itself, is a threat of eviction had been offered by Selene's counsel earlier in the first hearing:

> [RP § 7-113] defines what it means to threaten to take action. And it states that it is to take action that would cause a reasonable person to believe that there is going to be imminent dispossession. And then the legislature provides a time frame for the posting of the notice advising the recipient that someone may take action if you don't contact us in 15 days. I would submit to the Court that it is self-evident that the legislature would not have passed a statute that is self-eviscerating by supplying a 15-day time limit, which can be construed as a threat of imminent action.

E. 181–82.

At the second hearing, counsel for Century 21 also offered a concise argument rebutting the claim that posting the notice was a threat of imminent action to dispossess the property from a protected resident:

> The legislature prescribed a specific 15-day period. And unless we can conclude that the legislature decided to give someone a [primer] on how to threaten imminent action by following its mandatory language and notice, it's nonsensical. We can't go there. Otherwise—and I'm saying this as someone who has always cast a jaundiced eye on our brothers and sisters in Annapolis, but this one I think is very easy to look at. They would not have prescribed a time period in which to threaten imminent action. And we can't divorce that. There was no threat of eviction . . . there was no threat of imminence because the statute was followed.

E. 228.

As described in the orders detailed below, the circuit court judge ultimately agreed with Respondents' counsel that the posting of a notice under the procedures laid out in subparagraph (b)(2)(ii) and subsection (c) does not constitute a threat to take imminent

37

possession of real property. Although the circuit court did not expand on its reasoning in dismissing Petitioners' amended complaint, by doing so, it rejected Petitioners' contention that the Respondents threatened imminent eviction by posting the form notice required by statute on the Wheeling and Rodriguez properties.

4. *Do the Remedies Provide a Cause of Action for Not Conducting a "Reasonable Inquiry?"*

At the beginning of the first hearing, the Wheelings' counsel presented the circuit court with the factual scenario that a "reasonable inquiry" did not take place with the posting of the notice on the Rodriguez property. The Wheelings' counsel argued that Century 21 and Selene should have known that "the property wasn't abandoned because Ms. Rodriguez had appeared in the foreclosure case" and that the posting of the notice was a threat of imminent eviction. E. 167.

In response, at the beginning of the second hearing, Selene's counsel addressed the structure of RP § 7-113. After first noting that the definition under subsection (a)(5) for "[t]hreaten to take possession" includes the words "intends to take imminent possession," Selene's counsel focused on the prohibited acts in subsection (b)(1). In parsing the language of the statute, Selene's counsel noted that there was no violation of subsection (b)(1) because they did not take possession of the property under the prohibited acts of locking out the resident, diminution of services, or other actions that would deprive the protected resident of actual possession. Further, under subsection (b)(1), there was no threat to take possession under the prohibited acts because the only act taken was to post the notice. Since the definition in subsection (a)(5) requires a threat of "imminent"

38

possession, the posting of the statutorily mandated form notice with a 15-day provision cannot be interpreted to be an "imminent" threat.

Turning to the remedies in subsection (d), Selene's counsel explained that the remedies apply to the prohibited acts in subsection (b)(1). Emphasizing that subsection (b)(2) outlines exceptions where actual possession can be taken, the remedies do not apply to that subsection. Selene's counsel accordingly maintained that Petitioners' claims only fall under a "threat of possession" and subsection (b)(2) does not encompass threats to take possession.

The Wheelings' counsel did not rebut these arguments with any statutory interpretation about whether the remedies in subsection (d) apply under the statute for failure to conduct a "reasonable inquiry." Instead, counsel focused on arguments concerning the nature of the damages. When asked by the circuit court judge how to interpret the statute, the Wheelings' counsel responded: "It permits damages and losses. It doesn't have to say emotional distress. And under the law, [it is] crystal clear that [emotional distress] is a cognizable damage that is recoverable under Maryland law." E. 191–92.

At the second motions hearing, the Wheelings' counsel argued that the circuit court judge should defer to a January 7, 2014, advisory notice issued by the Maryland Department of Labor, Licensing, and Regulation's Office of the Commissioner of Financial Regulation (the "OCFR"). Commissioner of Financial Regulation, *Property Preservation – Nonjudicial Evictions*, Advisory Notice, Jan. 7, 2014. The administrative agency's

interpretation of the statute, as argued by the Wheelings' counsel, required the Respondents

to make a "reasonable inquiry" before posting the statutory form notice:

> The administrative agency goes on to say that before they post that notice, they have to make reasonable inquiry as to the occupancy of the property. Well, the well-pled facts before the Court and the amended complaint are they didn't do that. They didn't look at the public records. No one asked Mr. and Mrs. Wheeling or Ms. Rodriguez whether she was still in possession. And the well-pled facts show that they were in occupancy and they were holding themselves out as occupants and residents of the properties. There was no status. There was no check. They just posted the property.
>
> The statute doesn't say if you—you may just post the property and you're absolved of any responsibility that the agency that regulates my colleague's client says it has, his client has. And they make clear in their notice that's attached as Exhibit 3 to the amended complaint that the prohibition on non-traditional evictions applies to tenants as well as homeowners. They have to conduct a reasonable inquiry into the occupancy status of the property. And here the well-pled facts are they did none of that. They want to dispute that. I get that. That's for a different phase. And we highlighted in our brief that there's a decision about reasonableness. That's a factual issue that goes later. Looking at the well-pled facts, we've pled that their investigation was unreasonable.

E. 211–12.

Respondents' counsel analyzed RP § 7-113 and argued that the posting of a notice

under the statute is not actionable as an imminent threat to take possession.[14] In response

to Petitioners' invocation of the OCFR's advisory notice, Selene's counsel retorted:

> Your Honor, counsel spent lot of time talking about interpretations from the Commissioner of Financial Regulation, which we can all look at that two-page document and argue what it means. I would submit that it does not actually support the claim here notwithstanding counsel's best effort to try to shoehorn whatever the Commissioner has stated into these facts does not support the claim. And we can all read it.

---

[14] Selene's and Century 21's responses to Petitioners' arguments and the facts in the amended complaint contained parallel arguments.

But separately I just thought it was very telling that counsel did not even refer to the actual statute itself. The statute itself of course is the be all and end all of whether or not there is claim here. And we walk through that with respect to the definitions of (b)(1) and (b)(2) and then what (d) truly means. It sounds like, if anything, counsel may submit that the Commissioner could actually consider whether or not there's something improper about anything that happened here.

But the private right of action is expressly proscribed by the—or prescribed by the legislature. It is as it is. The legislature defined it. It is either you took possession, in which case you could fall within (b)(2) and have a claim. We don't have that scenario. [Subsection] (b)(l) is the only one that would apply. That would contemplate threatening to take possession. Referring back to the definition of that, the word imminent is used. Obviously, they meant it for something. They used it. We have to breathe life into that word and the only way you can do it is by finding that there was no imminent threat here.

E. 226–27 (indentation added).

In response to the Wheelings' argument that the court defer to the OCFR advisory notice, the circuit court judge probed the applicability of the advisory notice to her statutory analysis. The Wheelings' counsel reiterated that the court should defer to the OCFR's interpretation in applying the remedies in subsection (d) to the "reasonable inquiry" provision:

[W]e've provided as Exhibit 2 to the amended complaint a copy of an agency decision against parties just like the Defendants before the Court today for taking unlawful collection agency action in the eviction and threatened eviction of Maryland residents. And that agency's decision under the *Blackstone* case is entitled to some deference. These are the statutes that they regulate, that govern the agency.

E. 214.

The circuit court judge then inquired about whether judicial deference to the OCFR was required, specifically regarding the facts of this case:

| | |
|---|---|
| The Court: | But we don't have an agency decision in this case. |
| Wheelings' counsel: | As to my clients? |
| The Court: | These— |
| Wheelings' Counsel: | No, No, Your Honor. |
| The Court: | —or as to these Defendants. |
| Wheelings' counsel: | No, Your Honor. No, the agency decision that's before the Court as Exhibit 2 is for the Court's— it's the same one that was relied on by the Court of Special Appeals in *Blackstone*, it's only to give the Court persuasive authority . . . . [I]t says that the courts are supposed to give deference to the agencies who regulate certain statutes and entities. |
| The Court: | Right, but I don't have anything from the agency in this case for these facts. |
| Wheelings' Counsel: | No. |

*Id*. at 214–15.

Having clarified that there is no administrative decision in which a standard of deference needed to be shown, the circuit court judge heard opposing counsel's argument, held the matter *sub curia* and stated that she would render an opinion shortly.

5.      *The Circuit Court Grants Respondents' Motions to Dismiss.*

As explained more fully above, the circuit court judge made her ruling based on the facts contained in Petitioners' amended complaint and the parties' oral argument at two motions hearings. The Wheelings' counsel argued that posting the statutory notice was an imminent threat to evict and that the alleged emotional damages suffered by Petitioners

42

were actionable. Moreover, the Wheelings' counsel maintained that Selene improperly operated as an unlicensed collection agency under the Court of Special Appeals' decision in *Blackstone* and that the circuit court should defer to an OCFR advisory notice in allowing Petitioners' claims to survive at the motion to dismiss stage.

Respondents' counsel reasoned that abandonment is not covered by the threat of eviction clause, subsection (b)(1), and that subsection (b)(2) clearly provides an exception to the prohibited acts. Respondents' counsel maintained that the posting of a notice under the statute does not entitle Petitioners to the remedies in subsection (d) and that Petitioners did not plead sufficient damages. From this, Respondents argued that the appropriate disposition is to dismiss Petitioners' amended complaint for failing to state a claim upon which relief could be granted.

The circuit court issued two orders on November 28, 2017. The first order addressed the claims against defendant Gina Gargeu doing business as Century 21. With regard to the real property violation claim, the court "FOUND that the notice which Plaintiffs allege violate the provisions of Md. Code Ann., Real Prop. §7-113(c)-(d) (West 2017) is, as a matter of law, in conformity with the required notice." *Wheeling*, No. 24-C-17-000996, (Balt. City Cir. Ct. Nov. 28, 2017) (order granting Defendant Gina Gargeu's motion to dismiss). The circuit court also found that the professional services of a real estate salesperson are exempt from the MCPA. *Id.* As such, the circuit court granted the motion to dismiss and ordered that all claims against Ms. Gargeu are dismissed.

The second order granted Selene's motion to dismiss and stated:

> FOUND that dismissal is proper if the alleged facts and informed inferences would, if proven, nonetheless fail to afford relief to the Plaintiffs. [*See*] *Morris v. Osmose Wood Preserving,* 340 Md. 519, 531 (1995), and it is further
>
> FOUND that the Amended Class Action Complaint fails to plead sufficient facts which state a claim upon which relief can be granted where, the Plaintiffs were not evicted or otherwise deprived of their property, and therefore did not suffer any actual injury which is objectively identifiable. See *Lloyd v. Gen. Motors Corp*[.], 397 Md. 108, 142-143 (2007); [*see also*] *Hoffman v. Stamper*, 385 Md. 1 (2005); *McGraw v. Loyola Ford, Inc.* 124 Md. App. 560, 581 (Md. Ct. Spec. App. 1999).

*Wheeling*, No. 24-c-17-000996, (Balt. City Cir. Ct. Nov. 28, 2017) (order granting Defendant Selene Finance LP's motion to dismiss).

Although the circuit court did not explain its rationale, the circuit court judge found that the remedies in the statute apply when there has been an eviction or other actions that deprive actual possession and, absent the dispossession of the property, Petitioners failed to state a claim for which relief can be granted. In other words, the failure to make a "reasonable inquiry" does not trigger the remedies under the statute. If we look at the language of the statute in the context of the motions to dismiss before the circuit court judge, Petitioners asked the court to determine that the General Assembly intended for the remedies provided in subsection (d) to apply if a party seeking the right to possession fails to conduct a "reasonable inquiry into the occupancy status of the property" before posting a notice of eviction under subparagraph (b)(2)(ii). However, the General Assembly did not intend for subsection (d) to provide a cause of action for failing to conduct a "reasonable inquiry."

44

More clearly, however, the Court explicitly rejected Petitioners' contention that the required statutory form notice somehow transforms into an "imminent threat to take possession" absent Respondents conducting a "reasonable inquiry." The Majority's reversal of the circuit court has two practical effects. First, as explained *supra*, it creates a statutory cause of action for the failure to conduct a "reasonable inquiry" before posting the statutory form notice. Then, it unnecessarily transforms the form notice—that is required by statute—into a threat to take imminent possession absent the party seeking the right to possession making a "reasonable inquiry." Although ancillary to the Majority's primary holding, its decision to consider the statutory form notice as an imminent threat renders the statute self-eviscerating. As explained *infra*, I agree with the circuit court's determination that the General Assembly did not intend for the statutory form notice to constitute an imminent threat to take possession absent a "reasonable inquiry."

**D.** **The Majority's Incorrect Interpretation is Compounded by Transforming the "Reasonable Inquiry" into an "Imminent Threat to Take Possession."**

*1.* *The Majority Misinterprets or Ignores the Word "Imminent" in the Definition of "Threaten to Take Possession."*

After the concerns raised by both sides at the legislative hearings, the committee amendments added a statutory definition for "threaten to take possession." As discussed above and confirmed by the legislative history, the General Assembly's express intent defined "threat" to only include *imminent* threats.

The Majority wants to define "imminent" by a dictionary definition and disposes of the committee amendment's focus on "imminent" in a footnote. *See* Maj. Slip Op. at 23 n.8 ("Regardless, we decline to narrowly interpret the term 'imminent' and supply a

45

definition that is inconsistent with the remedial purpose of the statute."). However, to discern the legislature's intent in using the word "imminent" to define a threat for the purposes of this statute, we must look to the testimony of the housing advocates and tenants before the legislative committee.

The written testimony of Rental Housing Coalition universally outlined "imminent" threats, *i.e.*, immediate lockouts with little to no prior notice. The three tenants who testified during the house committee hearing described forced lockouts such as receiving a text message from the landlord without any prior notice that the locks had been changed and possessions placed under tarp outside the home. For others, the imminent threat was the landlord entering the home and changing the locks without any prior notice.

In addition to the written testimony of the Rental Housing Coalition, other advocacy organizations and housing attorneys described scenarios where residents received little to no notice before being evicted from their homes. C. Matthew Hill of the Public Justice Center, who led the coalition of proponents for House Bill 1308, made the following statement to the Baltimore Sun: "You're talking about instant homelessness[.]" *See* Bill File to H.B. 1308, Baltimore Sun Article – Advocates Ask Lawmakers to Update Eviction Law (2013). Mr. Hill went on to reiterate, as he did in the Public Justice Center's written testimony, that allowing immediate, no notice evictions contributes to a "Wild, Wild West mentality" that has no place today. *Id.*

It is clear that the General Assembly's intent in crafting the statute was to provide remedies only to those words or actions that imminently threaten eviction. The statutory form notice, in accord with the General Assembly's purpose in enacting that provision,

protects residents from the imminent, no notice evictions and forced lockouts contemplated in the legislative history of House Bill 1308.

In that context, the committee amendments defined "threaten to take possession" to require "words or actions intended to convince a reasonable person that a party claiming the right to possession intends to take *imminent possession* . . . ." RP § 7-113(a)(5) (emphasis added). Confirming this sense of immediacy, Black's Law Dictionary defines "imminent" as "threatening to occur immediately; dangerously impending" and "[a]bout to take place." *Imminent*, Black's Law Dictionary (11th ed. 2019).

Under the definition provided by the General Assembly, the statutory form notice and 15-day waiting period is not an imminent threat of eviction. Contrary to the Majority's conclusion, the Respondents' act of posting the notice was not a threat to take imminent possession. Instead, Respondents' actions complied with the provisions set out by the General Assembly in the statute. As the statute's form notice clearly states, the party in possession has 15 days before the party seeking possession may take any further action. Any other reading of the statute is illogical, including Petitioners' contention that Selene's posting of the statutory form notice is an unfair and deceptive trade practice. A reasonable person could not fear an imminent eviction given the 15-day window provided on the notice.

2. *Contrary to the Plain Language and Legislative Intent of the General Assembly, the Majority Creates a Cause of Action Where One Does Not Exist in the Statute.*

As explained above, the statutory form notice and 15-day waiting period is not an imminent threat of eviction. The Majority relies on its assumption that the statutory form

47

is an "eviction notice" in construing a cause of action for failure to make a "reasonable inquiry." Maj. Slip. Op. at 21 n.7 ("Had Selene and Ms. Gargeu undertaken the required "reasonable inquiry" into the occupancy status of the properties, presumably the eviction notices never would have been posted in the first place."). This is contradictory to the legislature's intent in passing House Bill 1308.

As the bill evolved in the General Assembly, an open-ended abandonment exception was refined and structured as a posting and notice provision to confirm whether a property was inhabited or abandoned. The General Assembly attempted to create a bright line process for determining abandonment by setting out a legal process, not provide a statutory means of threatening imminent eviction. Moreover, as the circuit court judge found, where no threat occurs, an eviction or other action depriving actual possession has to occur for the remedies to apply.

As part of the "sausage-making" in the legislative process, no penalties were created for the indiscriminate posting of a notice. Certainly, the remedies could apply as described above if, under the safe harbor, an eviction occurred and in a lawsuit for wrongful eviction, the plaintiff proves that there was a failure to make a "reasonable inquiry."

The Majority offers little to no explanation as to how Respondents' act of posting of a notice without first conducting a "reasonable inquiry" is somehow a threat to take possession. The statute does not equate posting a notice of eviction without conducting a "reasonable inquiry" to an actual eviction or threat of eviction. Where no imminent threat is made, or no actual eviction occurs, a plaintiff is not entitled to the remedies in subsection (d).

48

The Majority applies an "imminent threat" as occurring when the party seeking the right to possession fails to undertake a "reasonable inquiry," but that understanding of the connection between subsection (b)(1) and subparagraph (b)(2)(ii) reads words into the statute that do not exist.  This Court avoids supplying "missing language when there is a *casus omissus* in the legislative scheme by judicially creating a statutory provision that the legislature would probably have added if it had given any thought to the problem it had not addressed."  *Fisher v. State*, 367 Md. 218, 292 (2001) (Bloom, J., concurring and dissenting); *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012).  The General Assembly did not intend to create a self-eviscerating statute by equating the mandatory form notice to a threat of imminent eviction when the party seeking the right to possession fails to conduct a "reasonable inquiry."  This Court should therefore avoid such an interpretation.

In hindsight, a separate remedy such as a monetary fine or suspension of a business license, may have been an appropriate policy for the General Assembly to adopt to prevent the indiscriminate posting of the statutory notice.  However, the Majority's interpretation of the statute in order to achieve a policy-driven outcome improperly creates a cause of action where none was intended by the General Assembly.

3. *If Intended, the General Assembly Knows How to Draft Language that Clearly States a Penalty for Not Making a "Reasonable Inquiry."*

The General Assembly intended for the notice requirements in subparagraph (b)(2)(ii) to be preventative, not punitive.  The remedial nature of the statute encourages liberal use of the notice provisions and, when a party seeking the right to possession uses

49

the notice language drafted by the General Assembly, the notice prevents evictions when the property is not abandoned or vacant. Certainly, the General Assembly knows how to clearly add a penalty for failure to make a "reasonable inquiry" before posting a notice of eviction. They did not do so here. This Court should not substitute our policy preference by supplanting the General Assembly's intent with a creative interpretation of the statute.

The Majority's interpretation of subparagraph (b)(2)(ii) turns the statute on its head by determining that a party's failure to strictly adhere to that subsection somehow constitutes a threat to take imminent possession. Moreover, the language of subparagraph (b)(2)(ii) suggests that its requirements, although important, do not have a nexus to the remedies in subsection (d). Where a party seeking the right to possession does not threaten to take possession or actually take possession of real property, the General Assembly did not intend for the party in possession to recover under subsection (d).

4.    *The Legislative Intent is Clear that RP § 7-113 was Enacted to Prevent Evictions.*

As recognized by the extensive legislative history provided herein, it is clear that RP § 7-113 was enacted to prevent nonjudicial evictions or other actions that deprive actual possession. As evidenced by MVRG's conduct in *Nickens*, the actions that the General Assembly sought to eliminate in enacting House Bill 1308 are the verbal and physical actions that either imminently threaten eviction or actually cause the party in possession to be ousted from the property. Given the facts in *Nickens*, and the General Assembly's clear call to abrogate this Court's holding in that case, it is apparent that the General Assembly did not intend to prohibit the posting of a notice under subparagraph (b)(2)(ii) and

50

subsection (c) as a separate cause of action. *See* Dep't Legis. Servs., *Fiscal and Policy Note (Revised)*, *House Bill 1308*, at 2 (2013 Session) (expressing "intent that the bill supersedes the ruling of the Court of Appeals in *Nickens*").

Because RP § 7-113 was enacted to abrogate the common law, its language should be strictly construed. *Spangler v. McQuitty*, 449 Md. 33, 50 (2016). And while I agree with the Majority that RP § 7-113 serves a remedial purpose, I disagree that it must be read so broadly that a party in possession can file suit when they are not evicted from their property or imminently threatened with eviction.

### 5. *The Circuit Court Judge Correctly Interpreted the Statute in Dismissing Petitioners' Amended Complaint.*

After many pages of pleadings and two in-person hearings, the circuit court judge took a pragmatic approach to interpreting RP § 7-113. She evaluated the plain language of the statute and considered that the remedies pertain entirely to the repossession of the property. Having given thorough consideration to the arguments, the circuit court judge found that the amended complaint "fail[ed] to plead sufficient facts which state a claim upon which relief can be granted where, the Plaintiffs were not evicted or otherwise deprived of their property, and therefore did not suffer an actual injury which is objectively identifiable." *Wheeling*, No. 24-c-17-000996, (Balt. City Cir. Ct. Nov. 28, 2017) (order granting Defendant Selene Finance LP's motion to dismiss).

This outcome is correct based upon the plain language of RP § 7-113 and the legislative intent of the General Assembly when it passed House Bill 1308 in 2013. The

51

Majority now crafts a new remedy for the failure to conduct a "reasonable inquiry" that is not clearly expressed in the statutory language.

The focus of the Majority's concern is the indiscriminate use of the statutory form notice, and they address this concern by attaching a penalty to the "reasonable inquiry" requirement. But the General Assembly did not address this issue in the language of the statute; it only adopted the compromise language proposed during the committee work on House Bill 1308. If the Majority believes that a penalty is warranted for the indiscriminate use of the statutory form notice, this Court should properly interpret the statute but also recommend to the General Assembly that there may be policy reasons for the legislature to reconsider the language of the statute. *See In re S.K.*, 466 Md. 31, 57–58 (2019) ("In affirming this adjudication, however, we recognize that there may be compelling policy reasons for treating teenage sexting different from child pornography. . . . [And] in light of these policy concerns, such legislation ought to be considered by the General Assembly in the future.").[15]

This Court should also recognize that there are multiple policy reasons upon which the General Assembly could have determined to not craft such a remedy. The adoption of the safe harbor notice amendment proposed by the property owners was intended to

---

[15] During the 2021 legislative session, the General Assembly took notice of the analysis in the *In re S.K.* opinion about criminal and juvenile laws and their application to the cultural phenomenon of sexting and, in response, passed House Bill 180. *See* Dep't Legis. Servs., *Fiscal and Policy Note (Revised)*, *House Bill 180*, at 4–5 (2021 Session) (citing 466 Md. at 61). The Fiscal and Policy Note for the bill specifically references the Court's express call that "legislation ought to be considered" to address policy concerns regarding sexting by minors. *Id.* at 5.

circumvent potential court proceedings over whether a property was abandoned or not. Allowing the "reasonable inquiry" provision to serve as a safe harbor affirmative defense ameliorates the potential for ancillary litigation as to whether a property is abandoned.

Moreover, once the compromise was reached by the competing interest groups as expressed by the Public Justice Center email to Senator Anthony Muse, the legislators may have taken a hands-off approach to further revisions to avoid any complications to the bill's passage by upending the fragile consensus that had been forged between the housing advocates and the property owners. If a legislator may have noted the absence of a penalty for failure to make a "reasonable inquiry," it may have been a political reality for the legislator to allow this bill to move forward with the achieved consensus knowing that any problems that might arise could be fixed at a future legislative session.

Whichever policy decision was made by the General Assembly, this Court should refrain from second-guessing the plain language and clear structure of the statute. Where this Court's "search for legislative intent contemplates 'the consequences resulting from one construction rather than another,'" it is clear that the correct construction of the statute is to hold that Respondents' failure to conduct a "reasonable inquiry" before posting a notice under subparagraph (b)(2)(ii) does not provide Petitioners a cause of action subsection (d). *Johnson*, 467 Md. at 372 (quoting *Blaine v. Blaine*, 336 Md. 49, 69 (1994)).

The circuit court judge dismissed Petitioners' amended complaint because it "fail[ed] to plead sufficient facts which state a claim upon which relief can be granted." The Majority focuses on the first part of that finding as to whether, based upon the four corners of the amended complaint, there were sufficient facts to state a claim. But the

53

circuit court judge's finding is not based upon the sufficient pleading of facts. Instead, the circuit court's ruling is grounded on whether relief can be granted through the remedies in RP § 7-113. Specifically, the circuit court judge determined that no relief can be granted to Petitioners under the statute where the Respondents did not threaten to take possession or actually take possession of real property because the General Assembly did not intend for the remedies under subsection (d) to attach for the failure to conduct a "reasonable inquiry."

After analyzing the plain language and structure of RP § 7-113, the circuit court judge correctly granted Respondents' motions to dismiss Petitioners' claims and, upon appellate review, the Court of Special Appeals correctly affirmed the circuit court orders.

## CONCLUSION

The Majority's interpretation of RP § 7-113 improperly creates a cause of action where none was intended by the General Assembly. The remedies in subsection (d) are tethered to the prohibited acts in RP § 7-113(b)(1) and only allow for a party in possession to recover when the party seeking the right to possession threatens to evict, evicts, or takes any other action that deprives the protected resident of actual possession. None of these prohibited acts occurred here. Moreover, the text of the statute does not indicate that the General Assembly intended for Respondents' failure to strictly adhere to RP § 7-113(b)(2)(ii) to transform the posting of a statutory form notice into a threat to take possession. Instead, the abandonment safe harbor provision enacted by the General Assembly sets out an affirmative defense for a party who utilizes the abandonment exception in subsection (b)(2). Subsection (b)(2) does not create a separate cause of action

54

unless there is an eviction or other action that deprives actual possession.  It is for these reasons that I respectfully dissent.

Judge Hotten advises that she joins this opinion.